# THE

# New York Supplement

## VOLUME 60,

AND

# New York State Reporter,

## VOLUME 94.

---

(43 App. Div. 248.)

ARMSTRONG et al. v. SHELDON et al.

(Supreme Court, Appellate Division, Fourth Department. September 20, 1899.)

1. WILLS—AMBIGUITIES—EVIDENCE.

A clause in a will providing that the residuary estate shall be paid to "my heirs in portions according to the laws and statutes of the state of New York, the same as if I had died intestate," is so ambiguous as to justify the admission of extrinsic evidence and the examination of other parts of the will for an explanation thereof, where the will was drawn by testator, who was not a lawyer, all of whose property was personalty, and who had no relatives except a sister, and the children and grandchildren of other brothers and sisters, whose number of children varied greatly, in view of Code Civ. Proc. § 2732, which would have excluded all of said grandchildren from any distributive share in testator's property if he had died intestate, and would have entitled all of said children to have inherited per capita.

2. SAME—DISTRIBUTION ACCORDING TO STATUTE.

A will of a testator whose estate was all personalty, and who had no relatives except a sister, and the children and grandchildren of four other brothers and sisters, whose number of children varied greatly, provided that testator's residuary estate should go to his heirs in portions according to the laws and statutes of the state of New York, the same as if he had died intestate. Other portions of the will bequeathed scholarships to educational institutions, and provided that testator's "heirs" should have the benefit thereof, if qualified to enter the institutions. Testator had been as friendly towards his grandnephews and grandnieces as towards his other relatives. He was not a lawyer, and wrote the will himself. Along with the will was found a paper on which he had written the names of his relatives, including his grandnephews and grandnieces, who were described as his heirs, and after a group containing the names of the children and grandchildren of each deceased brother or sister appeared the fraction "⅕." *Held*, that the residuary estate should be divided per stirpes among all of testator's relatives according to the laws of descent,

and not according to Code Civ. Proc. § 2732, under which the division would have been per capita, and the grandnephews and grandnieces would have been excluded, if testator had died intestate.

Appeal from special term, Monroe county.

Action by Jesse J. Armstrong and another, executors of P. Charles Cole, deceased, against Charlotte A. Sheldon and others, for the construction of a will. From a judgment excluding testator's grandnephews and grandnieces from any share in testator's residuary estate, plaintiffs appeal. Reversed.

Argued before ₀ HARDIN, P. J., and ADAMS, McLENNAN, SPRING, and NASH, JJ.

John Van Voorhis, for appellants.
. Joseph A. Stull, for respondents.

McLENNAN, J.   On the 28th day of February, 1895, P. Charles Cole died in the city of New York, where he resided, leaving a last will and testament bearing date the 14th day of November, 1890, which was duly admitted to probate by the surrogate's court of New York county on the 1st day of May, 1895. Letters testamentary were on that day issued to the plaintiffs, Jesse J. Armstrong and Eugene Van Voorhis, who were named as executors in said will, and who duly qualified, entered upon the discharge of their duties, and are now acting as such executors. At the time of his death the testator was 88 years of age   He had never been married, and left him surviving no father, mother, brother, sister, or children or descendants . of children.

The testator had had five brothers and sisters, namely: (1) Almira Galusha.   She was living at the time the will was made, but died before the testator.   She left her surviving two children, Norman H. Galusha, who died before the commencement of this action, intestate and without issue, and Frances H. Van Voorhis, one of the defendants, and four grandchildren, namely, Martin, Harriet, and Myra Galusha, children of her deceased son Elon A. Galusha, and Morgan G. Kelley, a son of her deceased daughter Cornelia J. Kelley, and who died intestate and without issue before the commencement of this action.   The three living grandchildren are also made defendants. Frances H. Van Voorhis is a niece, Martin Galusha a grandnephew, and Harriet and Myra Galusha grandnieces, of the testator.   (2) Micajah M. Cole.   He died prior to the death of the testator, and left him surviving five children, namely, Charlotte A. Sheldon, George M. Cole, A. Jane Cole, Charles M. Cole, and Peleg Cole, nephews and nieces of the testator, and one grandchild, Mrs. Clarissa L. Combs, a grandniece, who is the child of Micajah M. Cole's deceased daughter Alcesta Ryman, all of whom are made defendants, except Charles M. Cole, who died before the commencement of this action, leaving a last will and testament, of which the defendant Laura Cole is executrix, and George M. Cole, who died intestate after this action was commenced.   The defendant Frank Dalton was duly appointed administrator of his estate, and has been duly substituted as defendant in his place and stead.   (3) Peleg Cole.   He died before the testator, and

left him surviving two children, namely, John G. Cole and Mary E. Kilpatrick, nephew and niece of the testator, both of whom are defendants. (4) A. Jane Armstrong. She died before the testator, and left her surviving two children, namely, Wheeler and George Armstrong, nephews of the testator, and two grandchildren, Jesse J. and Fanny Armstrong, children of her deceased son Jesse J. Armstrong, who are grand nephew and niece of the testator, and all of whom are made defendants. (5) Annjeanette C. Huntington. She died prior to the death of the testator, and left her surviving six children, namely, Albert, Frank, and Alcesta Huntington, Susan H. Hooker, Kate Taylor, and Carrie Jessup, nephews and nieces of the testator, and all defendants in this action.

It will be seen that all of the testator's heirs at law are nephews or nieces, except Martin, Harriet, and Myra Galusha, the children of Elon A. Galusha, deceased, who was a son of the testator's deceased sister Almira Galusha; Mrs. Clarissa L. Combs, the daughter of Alcesta Ryman, deceased, who was a daughter of said Micajah M. Cole; and Jesse J. and Fanny Armstrong, the children of Jesse J. Armstrong, deceased, who was a son of A. Jane Armstrong, deceased,—which six defendants are grandnephews and grandnieces of the testator.

The estate of the testator amounted to between one and two hundred thousand dollars, and consisted entirely of personal property. By his will he gave about $10,000 to found scholarships in four different institutions of learning, with the provision in each case, "my heirs to have the preference, if qualified to enter the same." By the seventh clause of the will the testator gave to Freelove E. Galusha, widow of Elon A. Galusha, the deceased son of Almira Galusha, who was the testator's sister, and to her heirs (who are her children, Martin, Harriet, and Myra Galusha), all the indebtedness which they or either of them owed to him at the time of his decease. By the sixteenth clause of his will the testator gave to Jesse J. Armstrong, a grandnephew, and Fanny Armstrong, a grandniece, a small amount of property. All the other specific legacies were to nephews or nieces, or the wives or husbands of such. The eighteenth and last clause of the will, after naming the plaintiffs as executors, is as follows:

"After transferring to my legatees the bonds and stocks heretofore mentioned, and paying my legacies, I hereby authorize and direct my said executors to dispose of the remainder of my estate and assets to best advantage, and pay the proceeds remaining after paying expenses to my heirs in portions according to the laws and statutes of the state of New York, the same as if I had died intestate."

The controversy arises over the proper construction or meaning of the residuary clause above quoted. No other part or provision of the will is in dispute or need be considered, except as it may aid in properly interpreting such residuary clause.

The contention of the plaintiffs is that the residuum of the estate should be divided among the heirs of the testator as real estate of persons dying intestate is distributed under the statute of descent, to wit, that the residuum should be divided into five equal parts, the number of brothers and sisters the testator had, and, such brothers

and sisters all being dead, that their children should take the part to which they would be entitled, respectively, if living, and that, if any of such children be dead leaving issue, such issue should take the portion to which the parent would be entitled if living, share and share alike. The contention of the answering defendants is, the estate being composed entirely of personal property, that the word "heirs" in the residuary clause should be interpreted to mean "next of kin," and that the entire residue of the estate should be divided per capita between the nephews and nieces of the testator living at the time of his death, and in accordance with the provisions of the statute of distribution (section 2732, Code Civ. Proc.) as it was at the time of the testator's death and before the amendment of 1898, and that the six grand nephews and nieces above named should be excluded from receiving any part of the same.

The question is presented, who did the testator designate as beneficiaries under his will by the words "my heirs," or, if the meaning of such words as used by him is ambiguous, who did he intend to so designate? The words "my heirs" were used by him to indicate the class of persons who should be the subject of his bounty. If the words are given their strict legal meaning, they include all who would have taken had the deceased died intestate, leaving an estate composed entirely of real property. If the testator had died possessed of such an estate, and had made the will in question, or had died intestate, no question could arise under the laws of the state of New York as to the right of his grand nephews and nieces, as well as his nephews and nieces, to participate in its distribution, and they would have taken per stirpes, and not per capita. Had the testator said by his will, even although his estate was entirely personal, "I give and bequeath to my heirs [naming them] the residue of my estate, to be divided among them according to the laws and statutes of the state of New York," no question could arise as to what persons were meant, and the only purpose of resorting to the statute in that case would be to ascertain what portions the persons named would be entitled to take. The statute which in such case would control is the statute of descent, and not section 2732 of the Code of Civil Procedure, the statute of distribution, as that statute does not relate to distribution among heirs, but only to next of kin, as defined by its provisions. On the other hand, if the testator, in effect, used the words "next of kin," the statute of distribution defines the persons entitled to take, and also defines the portion to which each is entitled.

The testator had the right to distribute the residue of his estate, although consisting entirely of personal property, precisely as if it had consisted entirely of real property. The words "my heirs," used by the testator to designate the distributees of his estate, if given their strict legal meaning, unless qualified by the character of the estate, or in their popular meaning, include all the testator's blood relatives, without reference to the degree of relationship, and, if such words are given that meaning, the portion of such relatives, respectively, must be ascertained and determined by reference to the statute of descent, because of the reference to the laws and statutes of the state of New York in the context. If the testator intended that his estate should

be divided between his heirs, the statute referred to must be the statute of descent, because it is the only statute which relates to the distribution of the property of intestates among heirs.   If the words "my heirs," as used by the testator, mean "next of kin," then the testator failed to designate in terms the persons who would take of his estate, but left it to the statute (section 2732, Code Civ. Proc., before amended) to determine the distributees, as well as the portion that each should take, respectively; because that statute alone determines who are the next of kin of a deceased intestate, and the share to which each is entitled as well.   Did the testator intend to say, as the words used imply, "I give the residuum of my estate to my heirs, to all my blood relatives, grandnephews and grandnieces, as well as nephews and nieces, to be divided according to the statute of descent, and in such manner that the children (if living) of each of my deceased brothers and sisters will take the share to which such brother or sister respectively would have been entitled if living, and, in case any of such children are dead leaving issue, then such issue to take the share to which the parent would be entitled if living"? Or did the testator intend to say, "I give and bequeath the residuum of my estate to such persons as are designated by the statute of distribution as next of kin, and by the terms of such statute are entitled to take, and to each the portion fixed by the statute"?   The question is presented, is the intent of the testator in attempting to designate beneficiaries ambiguous, considering the words used to indicate such persons and the context?   Can it be said that it is beyond doubt that, when the testator in terms devised the residue of his estate to his heirs, he meant to disinherit a portion of such heirs?   Did he intend that the words "my heirs" should have the same significance and meaning as "next of kin," which phrase has a restricted meaning under the statute?   The evidence discloses that the testator was not a lawyer, and presumptively was not familiar with the strict legal meaning of technical terms.   Considering the residuary clause entire, is it clear that when the testator declared in words that he wished his property to be divided among his heirs he intended it should be divided only between a portion of his heirs?   And, if so, under which statute did he intend the division should be made,— the statute of descent or the statute of distribution?   Or is the meaning ambiguous?

In Woodward v. James, 115 N. Y. 346, 22 N. E. 150, the testator left a large estate, consisting of both real and personal property. The clause in the will which was under consideration was as follows: "I give, devise, and bequeath to my legal heirs the remainder of the income of my property during the life of my wife."   In that case the court felt called upon to determine what the testator meant by "legal heirs."   No rule of construction was found which in and of itself was deemed conclusive, but the court gave force and effect to many circumstances not disclosed by the clause in question or by the will in its entirety.   The context and other provisions of the will, the character of the estate, the number and situation of the heirs, and the relationship they respectively bore to the testator, were all considered to determine the meaning of the words "legal heirs," as used by the

testator, and his intent. The court says (page 358, 115 N. Y., and page 152, 22 N. E.):

"We are thus required to determine whom the testator meant by 'legal heirs,' and whether he intended to designate by that phrase the individuals merely who should take, or to fix also the quality of the interest which should devolve upon each."

After a discussion as to what the testator meant by the use of the phrase "legal heirs," considering only the phrase itself, the context and other provisions of the will, the court adds:

"This testator knew that there was a wide difference in the relationship to him of his heirs. He had a brother living. His brother Reuben, who was dead, left seven children. Did the testator mean that each one of these should take as much of his estate as his living brother, and so that one brother, through his descendants, should take seven times as much as the other brother living? If he intended such a discrimination, we should expect some decided manifestation of it. The conclusion to be reached upon this will is not altogether clear and obvious, but I am inclined to agree with the general term that the testator meant by the phrase 'legal heirs' those who would take in case of intestacy and those prescribed by the statute, grounding such conclusion not merely on the situation, but also upon the language of the will; since, as was said in Ferrer v. Pyne, 81 N. Y. 284, the rule of a per capita division will yield to a very faint glimpse of a different intention."

So much is quoted from the opinion of the learned court for the purpose of showing that the meaning of the testator in that case, when he used the phrase "legal heirs," was regarded as ambiguous, and therefore the true meaning of the testator was sought for in the phrase itself; the context, the other provisions of the will, the character of the estate, the situation of the heirs, the relationship which they bore to the testator, respectively, and the iniquity and injustice of the construction contended for, all were considered.

In Lawton v. Corlies, 127 N. Y. 100, 27 N. E. 847, the will of G., after directing his executors to pay his debts and funeral expenses, contained the following: "I order and direct that my estate be divided among my heirs at law in accordance with the laws of the state of New York applicable to persons who die intestate," etc. The court, in discussing what the testator meant by the use of the words "heirs at law," said: "It depends upon the intention of the testator, which is to be gathered from the few words used by him in relation to the subject considered, if their meaning is doubtful, in the light of the circumstances surrounding him when he used them." 4 Kent, Comm. 535. For the purpose of ascertaining the real intent of the testator in that case, the court considered not only the phrase "heirs at law" in its popular and strict meaning, but also the context, the object of the testator in making a will, the unfortunate situation of one sister, the character and situation of his property, both at the time the will and codicil were executed and at the time of his death. Considering all those circumstances, it was held in that case that the testator intended that the phrase "heirs at law" as used by him should mean the same as "next of kin" as defined by the statute of distribution, and that the distributees and the portion of each should also be determined by such statute. The broad rule, however, was stated as follows, and is of universal application: "Where technical

words in a will, uncontrolled by the context, are presumed to have been used in their technical sense, still the context may overcome the presumption when it appears thereby and from extraneous facts of the kind already alluded to that the testator used the words in their common and popular sense."

Tillman v. Davis, 95 N. Y. 17, cited by respondents' counsel, is a case where, by the terms of the will, the entire estate became personal property before distribution, and it was held that the word "heirs," when applied to its succession, meant "next of kin." In the will under consideration in that case there was nothing in the context, or in extraneous facts, to indicate that the word "heirs" was not used by the testator in accordance with the above definition, so the conclusion was reached that the statute of distribution controlled, and that only the next of kin were entitled to take. But again, the true rule to be followed in the construction of wills was stated as follows: "The primary object of all construction of wills is in each case to ascertain the intention of the testator, and to give effect to that rule within the rules of law. The words 'heirs,' and 'next of kin,' may be so used in association with other language and under such circumstances as to show an intention to include others than blood relatives," etc. The intention of the testator must control when it can be ascertained from the words used, but the context and the other provisions of the will, and even extraneous facts, may be resorted to to aid in ascertaining such meaning, when necessary, if the instrument as a whole is ambiguous. Ritch v. Hawxhurst, 114 N. Y. 512, 21 N. E. 1009; Lytle v. Beveridge, 58 N. Y. 592; Crosby v. Wendell, 6 Paige, 553; Greene v. Greene, 125 N. Y. 509, 26 N. E. 739.

The cases referred to, and many others which might be cited, establish the proposition that when the words "heirs," "legal heirs," or "heirs at law" are used in a will, for the purpose of designating the distributees of an estate composed entirely of personal property, and their meaning is not ambiguous, or changed or modified by the context or other parts of the instrument, they are equivalent to and mean "next of kin," and, unless otherwise provided, the statute of distribution determines the portion each distributee is entitled to take. But it is equally well established that it is the province and duty of the court in each case to ascertain what the testator meant and intended when he used such words, and, when so ascertained, to give to such meaning and intent full force and effect; and also that such meaning may be learned from the words themselves, the context, the instrument considered as a whole, and all the circumstances surrounding each particular case. Courts will not substitute "next of kin" for "heirs" in a testator's will, and thereby create an entirely different class of persons as legatees, unless it appear that such substitution is necessary in order to make operative and effectual his intent. Rules for the construction of wills which are useful, and often controlling, have been formulated by the courts, but, as said in Crosby v. Wendell, supra: "The intention of the testator is the pole star to guide in the construction of a will." And as said by Judge Allen in Lytle v. Beveridge, supra:

"Rules of construction are resorted to as helps or aids in arriving at the intent of the testator, and ought not to be followed when they lead to results subversive of such intent. There is no rigid rule of law to the effect that words shall only be used in one certain sense, or requiring courts to give only the same interpretation and effect under all circumstances and in every connection. The infinite variety of circumstances that may occur, distinguishing one case from another in the use of the same words and phrases, renders it impossible to give an absolute and unbending rule for the interpretation of language applicable to all cases. Mr. Chitty, in commenting on Perrin v. Blake, 4 Burrows, 2579, says: 'To argue that the intention shall be frustrated by the rule of construction of certain words is to say that the intention shall be defeated by the use of the very words which the testator has adopted as the best to communicate his intention, and of which the sense is intelligible to all mankind.'"

In the case at bar the testator designated the persons who should take the residuum of his estate by the use of the words "my heirs." If the fact that his entire estate consisted entirely of personal property be eliminated, and the word "heirs" is given its strict legal meaning, or its common and popular meaning, the nephews and nieces and the grand nephews and nieces of the testator are all included in the designation. From the single circumstance that the estate is entirely personal, the learned counsel for the respondent asks the court to substitute for the word "heirs" the words "next of kin," and thus exclude the grand nephews and nieces from sharing in his estate.

The foregoing considerations lead to the conclusion that the clause of the will under consideration is ambiguous; that by it alone the intent of the testator cannot be ascertained with certainty; that, he not having been a lawyer and having prepared his own will, it is uncertain whether he knew or understood the legal distinction between "heirs" and "next of kin," and that such meaning depended upon the character of the estate. It is therefore incumbent upon the court to examine the entire will, and consider such extraneous facts as are disclosed by the record, to ascertain what was the real purpose and intent of the testator; to ascertain whether he intended, as he declared, that all his heirs should take of the residuum of his estate, or whether he intended that only his next of kin, and thus only a portion of his heirs, should so take.

An examination of the entire will discloses the fact that the testator used the words "my heirs" five times, and did not use the words "next of kin" at all. As the words "my heirs" are used in connection with the bequests to the four institutions of learning, it is obvious that the testator intended that they should be given their ordinary, common, and popular meaning. It will not be contended that the grand nephews and nieces of the testator are excluded, or were intended to be excluded, from participation in the valuable privileges conferred by those provisions of the will. When the testator said in the sixth clause of the will, by which the University of California was given $1,000 for a scholarship, "my heirs to have the preference or benefit, if qualified to enter said university," it is clear he meant that all his heirs, his grand nephews and nieces as well as his nephews and nieces, should be eligible to enjoy the scholarship thus created. He did not intend that only a part of his heirs, to wit, his nephews and nieces, should be entitled to participate. This is true of each of the clauses

of the will relating to the institutions of learning, respectively. The only other place where the word "heirs" is used outside of the residuary clause is to designate the children of Freelove E. Galusha, the widow of Elon A. Galusha, a deceased son of the testator's sister Almira Galusha. The purpose and effect of that provision was to cancel any and all indebtedness which Freelove E. Galusha and her heirs owed to the testator. It is clear that when the testator used the words "my heirs" in the five separate places above referred to he intended that they should have and be given their usual and ordinary meaning and significance. It was not intended that they should have or be given the restricted meaning which would result if the words "next of kin" are substituted in their place. Yet with equal force it may be argued that only the next of kin of the testator are to enjoy the benefits of the four several scholarships created by him, as that only the next of kin are to participate in the distribution of the residuum of his estate. The use of the word "heirs" by the testator in the five several places above alluded to quite conclusively shows that the words "my heirs" in the residuary clause were used by him to designate and were intended to include his one sister who was living at the time of the execution of the will, the children of his deceased brothers and sisters who were living, and the issue of those who were dead. It appears by the will itself that at the time it was prepared the testator knew of and had in mind his grand nephews and nieces, as well as his nephews and nieces. Jesse J. and Fanny Armstrong, grand nephew and niece, respectively, were given legacies; the three children of Freelove E. Galusha, also grand nephew and nieces, were forgiven their indebtedness; and several, but not all, of his nephews and nieces were given specific legacies.

It appears by the evidence in the case that the deceased, at the time of his death and for many years prior thereto, sustained intimate relations of friendship with Freelove E. Galusha, the widow of his deceased sister's son, and her three children. They resided in the city of Rochester, and when the testator visited that city it was his custom to make his home with them. In his last illness the mother of these children was called to his bedside to care for and comfort him. It also appears that his relations with Jesse and Fanny Armstrong, also grand nephew and niece, respectively, were of a friendly character. While those circumstances, in and of themselves, are not of much importance, they, at least, are sufficient to show that there was no reason why, when the testator used the words "my heirs," which included them, he should have intended to use the words "next of kin," which, in effect, would exclude them.

Again, it appears that the testator's sister Almira Galusha left her surviving only one child; another sister, A. Jane Armstrong, left her surviving only two children; and Peleg Cole, a brother, left only two. The other brother, Micajah M. Cole, left five children; and the testator's other sister, Annjeanette C. Huntington, left her surviving six children. Did the testator intend that his sister Mrs. Huntington, through her representatives, should have six times as much as the representatives of his sister Mrs. Galusha, and that the issue of his brother Micajah should have five times as much? That the represen-

tatives of his brother Peleg should only take two shares, and that the representatives of Micajah should take five shares? That the representatives of his sister Jane should take two shares, and the representatives of his sister Annjeanette six? There is no language in the will, or circumstances disclosed by the evidence, to indicate that the testator intended to make such discrimination. In fact, it appears by the evidence that those who would thus take the smaller portions were his favored relatives. If the contention of the learned counsel for the respondents is to prevail, and the residuum of the estate is to be divided as if the testator had used the words "next of kin" instead of "my heirs," such must be the result. Section 2732 of the Code of Civil Procedure, as it stood before the amendment of 1898, declared that distribution of an estate of an intestate among "next of kin," where all are nephews and nieces, must be per capita. That such a division would be unjust and inequitable in a case like the one at bar is recognized by the highest courts of this and other states, and a construction of a will which will lead to such result will not be adopted unless such an intent on the part of the testator clearly appears. In this case there is more than "a very faint glimpse of a different intention," and therefore the rule of a per capita division must yield. Woodward v. James, supra.

The will of the testator was executed on the 14th day of November, 1890, and, as before said, was in his own handwriting. It was found in an envelope after his decease. About the same time a paper was found, in the handwriting of the deceased, which was dated November, 1890, the same month the will was executed, which purports to, and in fact does, as the evidence shows, name every heir of the deceased. In detail it specifies the children of each of the brothers and sisters of the deceased, and the issue of such children in case of their decease, except in the case of Almira Galusha, the mother of the defendant Frances H. Van Voorhis and the grandmother of Martin, Harriet, and Myra Galusha, she being living at the time the will and the memorandum in question were made, and by such memorandum all are declared to be his heirs. This memorandum is headed, "P. Charles Cole's heirs. November, 1890." He then gives the name, "Almira Galusha, Rochester, N. Y.," and opposite a bracket inserts the figures "1/5." The testator then proceeds, "Heirs of my deceased brother M. M. Cole are." He then gives the names of each of the children of M. M. Cole, and the grandchild Mrs. Clarissa L. Combs, the daughter of the deceased child of M. M. Cole, and opposite that group of names he places the figures "1/5." Next is recited, "Heirs of my deceased brother Peleg Cole are," and the names of the children of Peleg Cole, two in number, are given, and opposite this group of names the figures "1/5" are placed. Next is recited, "Heirs of my deceased sister A. Jane Armstrong are," and then the children of such deceased sister are named, as also the defendants Jesse J. Armstrong and Fanny Armstrong, who are the issue of a son of such deceased sister, and opposite that group he places the figures "1/5." Next and last the memorandum recites, "Heirs of my deceased sister A. C. Huntington are," and then follow the names of the children of such deceased sister, and opposite that group the figures "1/5" are

placed.    The residuary clause of the will being ambiguous, it being uncertain who the testator meant by the words "my heirs," it being uncertain who he intended should be the objects of his bounty, or the amount he intended each should receive, it is concluded that the memorandum before referred to, being the paper written by the testator bearing date November, 1890, and which contains a list of all of the testator's heirs, was admissible in evidence and should have been received for the purpose of explaining what the testator meant when he wrote "my heirs," but not for the purpose of showing what he intended to write.    2 Woerner, Adm'n, p. 891, § 421.    At page 891 the author says:

"Courts of law admit extrinsic evidence of intention to make certain the person or thing intended, if the description in the will is insufficient, in cases where the object of the testator's bounty, or the subject of disposition (i. e. the person or thing intended), is described in terms which are applicable indifferently to more than one person or thing."

And at pages 892 and 893 it is said:

"The general rules of evidence announce the admissibility of parol evidence to remove latent ambiguities and to rebut in the same way ambiguities raised by proof aliunde."

Extrinsic evidence which aids in the interpretation of what is written in the instrument is properly received, but not evidence of intention independent of the instrument.    "Evidence is received, not for the purpose of importing into the writing an intention not expressed therein, but simply with a view of elucidating the meaning of the words employed."    1 Am. & Eng. Enc. Law, p. 53.

In Le Fevre v. Le Fevre, 59 N. Y. 434, the court says:

"A misnomer or misdescription of a legatee or devisee, whether a natural person or a corporation, will not invalidate the provision or defeat the intention of the testator, if, either from the will itself or evidence dehors the will, the object of the testator's bounty can be ascertained,  *  *  *  and parol evidence may be given to ascertain who were intended by the testator."

The rule was correctly stated by Judge Doolittle in the above case at special term (2 Thomp. & C. 334).    He says:

"Parol evidence in such cases is admissible to identify the legatee.    It is not evidence to show the testator intended something different from what he had stated in his will, but to show what the words used in the will mean, or what the testator intended by them."

In the case at bar, who—what persons—did the testator intend by the words "my heirs"?    As before seen, their identity is uncertain. For the purpose of identification, parol evidence is admissible.    It would not be admissible for the purpose of showing that the testator intended some one not his "heirs," but is admissible for the purpose of showing who he intended to include in that term when his meaning by its use is ambiguous.

If right in concluding that the memorandum (so called) should have been received in evidence, and that it may properly be considered in determining who the testator designated or intended to designate as his legatees by the use of the words "my heirs," all doubt as to the meaning of the testator is removed, and it becomes plain and certain that by the words "my heirs" in the residuary clause of the will he

intended to include, as the words imply, not only his nephews and nieces, but his grandnephews and grandnieces as well, and that the words, "in portions according to the laws and statutes of the state of New York, the same as if I had died intestate," refer to the statute of descent, and clearly indicate the intention that the residuum of the estate should be divided per stirpes, and not per capita. The conclusion is reached that it was the intention of the testator that the residue of his estate should be divided into five equal parts, one part to go to the children, if living, of each of the testator's deceased brothers and sisters, share and share alike; and in case any of such children are dead, and have left issue them surviving, then the issue of such deceased child or children are entitled to the share such parent would take if living, share and share alike; and judgment should be entered directing the executors to make distribution accordingly. It follows that the judgment appealed from should be reversed, and a new trial granted, with costs to the appellants to abide the event, payable out of the estate.

Judgment reversed, and new trial granted, costs to appellants to abide the event, payable out of the estate.    All concur.