(57 App. Div. 532.)

### In re FIDELITY TRUST & GUARANTY CO. OF BUFFALO.

(Supreme Court, Appellate Division, Fourth Department.   January 29, 1901.)

WILLS—CONSTRUCTION—DESIGNATION OF DEVISEE—HEIRS.
> Where personal property alone is devised to the heirs of a testator who dies intestate as to the bulk of his estate, consisting of real and personal property, and the will does not show that he has employed the term "heir" in its technical sense, it will be presumed that he has used it to indicate next of kin, who succeed to personal property in case of intestacy.

Appeal from surrogate's court, Erie county.

Judicial accounting by the Fidelity Trust & Guaranty Company of Buffalo, as administrator with the will annexed of John T. Hudson, deceased. From a final decree settling the executor's accounts, Louisa B. Allen, a daughter of testator's first cousin, appeals. Affirmed.

The proceeding was instituted by the petition of the executor. Answers were interposed by the special guardian of three infants, grandchildren of one of testator's first cousins, and by three incompetent persons, the children of one of his first cousins, by which they claimed the right, as his heirs, to share in the remainder of the trust fund created by the fourth clause of testator's will and the eighth clause of the codicil thereto. Thereupon an order of reference was granted to take evidence as to the persons entitled to take said fund, and to examine the account filed by the executor, to hear and determine, subject to confirmation by the court, all questions arising upon the settlement thereof that the surrogate would have power to determine, and to report with his opinion thereon, and also to report what sum remained in the hands of the executor for distribution, and the amount payable to each person found to be entitled to share therein. By the first clause of the will testator directed the payment of his funeral expenses, the expense of a suitable headstone, the costs and disbursements incident to proving the will and to the administration of his estate, and authorized the sale and conveyance of any portion of his property. The second clause directed the erection of a suitable family monument on his burial, put in Forest Lawn, at an expense not exceeding $5,000, and a suitable headstone at the grave of his son. The third clause bequeathed to Mrs. Elizabeth Jordan Whelan, whom he describes as "the trusted and faithful friend of my deceased wife and son," such of his household furniture "as she may select; and also for and during the term of her natural life an annuity or clear yearly rent or sum of $700, free of all taxes and other deductions," payable quarterly from the time of his death. The fourth clause directs his executor to set apart and create out of his personal and real estate a trust fund of $25,000, and to invest and keep the same invested in good securities, such as certain railroad stock (which he mentions), government, state, or municipal bonds, or bonds or mortgages on unincumbered real estate in the county of Erie, "so as to realize the best attainable rate of interest consistent with security in the investment, and in creating said fund to retain and hold any of the above-mentioned stock or bonds or other good securities that may belong to my said estate at my decease, and to keep said fund so invested as to obtain the best attainable rate of interest consistent with its security, and so long as the same shall be required to pay the annuity hereinbefore devised and bequeathed; and out of the interest, dividends, and proceeds of said fund to pay" (1) the said annuity to Elizabeth J. Whelan, and the expense of her last sickness and funeral, and of a proper tablet to be erected at her grave; (2) the expenses of keeping, investing, and reinvesting and paying out said fund and the taxes thereon; and (3) "the surplus, if any, of the annual income of said fund after making the payments above provided for shall at the end of each year during the continuance of said trust—that is, during the life of the said Elizabeth Jordan Whelan—be divided equally between the Buffalo Homeo-

pathic Hospital and the Home for the Friendless, * * * and paid to them annually, share and share alike. Upon the death of said Elizabeth Jordan Whelan the principal remaining of said fund I direct to be paid by my said executor and trustee to my heirs, or to such other person or persons or object as I may by a future will, or a codicil to this will, direct." The testator then authorizes his executor to sell and convey any portion of his real and personal property "for the purpose of raising, investing, and continuing the said fund of twenty-five thousand dollars as hereinbefore directed." The fifth and last clause merely appoints an executor, and makes a bequest to him in addition to legal fees and commissions. The first clause of the codicil ratifies and confirms the will, except as inconsistent therewith. The second appoints an additional executor, with a bequest in addition to fees and commissions; and in the third the executors are requested to erect a headstone with suitable inscription at testator's grave, and to cause an inscription to be made on his monument, and are released from erecting the monument and headstone referred to in the will on account of his having already done so. By the fourth clause the testator gives a legacy of $5,000 to said Elizabeth Jordan Whelan. The fifth clause gives to the Buffalo Historical Society $1,000, and commits to said society "the custody of my family pictures, portraits, and miniatures and Family Bibles, and my Revolutionary trunk that belonged to my grandfather, and my watch, watch chain, and seal, and keys, and any other jewelry, and other pictures, ornaments, or articles of taste, curiosity, or art, I may have; none of which articles are to be sold or disposed of by my executors, but are to be given up by said society on the order of my executors to such of my relatives as would be entitled to them." The sixth clause bequeaths "to the heirs of Anna Maria Craig, deceased, who is not related to him, the portrait" of her which he has, and whatever may remain due and unpaid to him under her will. By the seventh clause he gives, devises, and bequeaths to a certain person designated, and to "the heirs" of another person designated, and to their heirs and assigns, none of whom were related to him, a lot and building in the city of Buffalo, and certain bank stock standing in his name in three specified banks. The eighth clause of the codicil is as follows: "I direct my executors to retain all of my stock in the New York Life Insurance and Trust Company as a part (estimate at its par value) of the fund of twenty-five thousand dollars provided for in my will to provide an annuity for the benefit of Mrs. Elizabeth J. Whelan and for other purposes therein named during her life. The annual sum or annuity given by my said will to said Mrs. Elizabeth J. Whelan, and directed to be paid from the income of said fund, is hereby increased from the sum of seven hundred to the sum of one thousand dollars per year, free from all taxes and other deductions, and payable quarterly at the times and in the manner in my said will directed. The surplus, if any, of the annual income of said fund after making the payments in the first and second subdivisions of the fourth clause of my will as modified by this clause of my codicil provided, instead of being paid as in the third subdivision of the fourth clause of my will provided, I direct to be paid during the lifetime of said Mrs. Elizabeth J. Whelan one-fourth to the Buffalo Homeopathic Hospital, one-fourth to the Home of the Friendless situated in the city of Buffalo, one-fourth to the said Mrs. Elizabeth C. Rhoades, and one-fourth to the heirs of the said James R. Craig; and after the decease of Mrs. Whelan I direct my executors to give and devise the twenty-eight shares of the said stock of the New York Life Insurance and Trust Company, and one-half thereof to the said Mrs. Elizabeth C. Rhoades or her heirs, and the other one-half thereof to the heirs of the said James R. Craig, and pay the remainder of said funds to my heirs. In case of the death of Mrs. Whelan during the running of any term for which her share of the income from said term so as aforesaid given her shall not have been paid to her, the proportionate share of her said income or annuity for said unexpired term up to the date of her decease, not already paid to her, shall be paid to her legal representatives." The ninth clause provides for an inscription on the headstone which he has erected for said Elizabeth J. Whelan, and the tenth forbids any interment in his cemetery lot except that of his deceased son, himself, and Mrs. Elizabeth J. Whelan, or any other inscription upon the monument

or headstones on said lot unless he should otherwise direct by a written appointment. By the eleventh clause he gives and devises his pew in the First Presbyterian Church to the church society, and directs the executors to pay all taxes and assessments remaining unpaid thereon. The twelfth clause makes a bequest to William Henry Crosby, to whom he was not related, or, if he be not living, to the Reverend Dr. Howard Crosby, "his heirs and assigns, the miniature or silhouette which I have of their mother," and a set of Shakespeare and the book rack therefor. The thirteenth clause expresses the wish that his library of miscellaneous books, "except the law books," shall not be sold, "at least not at auction"; but he authorizes his executors "to give and distribute them to and among my heirs, at their discretion." The fourteenth and last clause authorizes the executors, in their discretion, to use his stock in the Niagara Falls International Bridge Company and in the Niagara Falls Suspension Bridge Company as a part of the trust fund of twenty-five thousand dollars thereinbefore provided for, and in lieu of any railroad bonds specified in the fourth clause of the will, but not in lieu of any other securities specified in said clause, nor in lieu of his stock in the New York Life Insurance & Trust Company, specified in the codicil. The referee made elaborate findings of fact enumerating all of testator's heirs and the degree of their relationship to him, and decided that the first cousins only, they being testator's next of kin, were entitled to share in said fund. The report of the referee was confirmed by the surrogate. The will was dated and executed on the 15th day of April, 1876, and the codicil thereto was made and dated on the 20th of July, 1880. Testator died on the 16th of April, 1887. The will was admitted to probate on the 27th day of July, 1888, and letters testamentary were thereupon issued to James H. Madison, the sole surviving executor named therein. Said Elizabeth J. Whelan died on the 16th day of August, 1896. The other material facts are stated in the opinion.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

Henry Adsit Bull, for appellant.

Jacob Stern, A. Frank Jenks, and Willard Parker Butler, for various respondents.

Rogers, Locke & Milburn, for Fidelity Trust & Guaranty Co.

Nelson M. Redfield, as guardian ad litem for Gerald B. Gould.

Tracy C. Becker, as special guardian for Archibold, Ann, and Mary Smith.

LAUGHLIN, J. The principal question presented by this appeal is whether, by the bequest of the remainder of the trust fund of personal property in the fourth clause of the will and eighth clause of the codicil thereto to "my heirs," the testator meant all of his blood relatives who would take if the property were real estate, or whether he intended thereby to include only his next of kin. Although the extent of testator's property is not shown, it is conceded that he left quite a fortune, consisting of both real and personal property. The referee found that by his will the testator "made no disposition of the bulk of his estate, which descended as though he had died intestate." It thus appears that testator left a large estate, for he disposed of more than $50,000 by the will. The main purpose of the will seems to have been to create this trust, and to provide for its execution. The referee found that the testator, at the time of his death, left him surviving as his next of kin and nearest heirs 14 first cousins. He also left many other heirs sustaining the relationship to him of first cousins once and twice removed, respectively, and con-

sisting of children and grandchildren of his deceased first cousins. Appellant belongs to the former class, the testator having survived her father, who was his first cousin. It will be observed from the abstract and extracts given that the will, although intelligently and quite clearly drafted, does not employ legal terms, and especially the word "heirs," with technical legal discrimination. There are many bequests of personal property to "heirs," but the words "next of kin" are nowhere employed. No heir or next of kin of the testator is specifically named in the will. As has been seen, there was no bequest or devise of the remainder of his property other than the remainder of their trust fund. The "bulk" of his estate, consisting of both real and personal property, was left to be distributed among his next of kin, or to descend to heirs pursuant to the statutes of distribution and descent according to the character of the property. Upon these facts, what is the legal effect and meaning of the words "my heirs," as used by the testator in disposing of part of the remainder of this trust fund of personal property? Did he use these words in their technical, legal sense, and thereby bequeath the fund to all heirs the same as if it had been real estate, or did he use them in the restricted sense in which they are often employed in bequeathing personal property,—to designate his next of kin? Schouler says (Schouler, Wills, p. 551, § 542):

"The word 'heirs' in a bequest of personal property, referring to the heirs of A., means, then, prima facie, the person who would be entitled to that property had A. died intestate; and this whether A. is the testator himself, or some one else named in the will, and whether the gift is substantial (as in the bequest to A. or his heirs), or original (as to 'the heirs of A.'). In other words, heirs is not 'next to kin' according to civil computation, but the statutory next of kin or distributees, those who for the purpose of succession stand in a position analogous to that occupied by heirs, as to real estate, under the law of descent."

Again, in section 547 he says:

" 'Heirs,' in a popular sense, prima facie denotes next of kin under the statute of distribution, so far as a gift of personalty is concerned. * * * But where the real and personal estate are given together, and not so inseparably blended, 'heir' is better treated as an elastic term; and in such cases the intention intimated is rather that 'heirs' was used in a twofold meaning, namely, heir at law as regarded real estate, and next of kin concerning the personalty; for where the word 'heir' is used to denote succession, it may, in our day, be well understood to mean such person or persons as would legally succeed to the property according to its nature or quality. In all cases, however, the testator's intention, if manifest, must govern."

Underhill says (2 Underh. Wills, § 619):

"In the case of a gift of personal property, made either to the heirs of the testator or to the heirs of another person, the question may arise whether the word 'heirs' is employed as meaning those to whom land descends—which is its ordinary sense—or whether it is used to indicate those only who take the personal property in case of intestacy. Where personal property alone is bequeathed to the heirs, either of the testator or of another person, and the will itself does not show that the testator has employed the word in its technical sense, it may be presumed that the testator has used it to indicate the next of kin according to the statute, who succeed to the personal property, in case of intestacy."

The same rule is stated with approval in 2 Redf. Wills, p. 62; Hawk. Wills, 92, 93; 2 Williams, Ex'rs, 969.

In Montignani v. Blade, 145 N. Y. 111, 39 N. E. 719, the court say (page 122, 145 N. Y., and page 720, 39 N. E.):

"But, where the bequest is of personal property, the word 'heirs' is taken to mean those in the line of distribution, or the next of kin; and where the will shows on its face that the person whose heirs are referred to is, to the knowledge of the testator, at that time living, it is obvious that it is not used in its strict technical sense, but means, in the case of land, heirs apparent, or those who would be the heirs were the living ancestor deceased (Heard v. Horton, 1 Denio, 168), and, in the case of personal property, next of kin, who would be such were the ancestor deceased."

The general rule was so declared by this court in the case of Armstrong v. Galusha, 43 App. Div. 248, 60 N. Y. Supp. 1, in the following language (page 257, 43 App. Div., and page 7, 60 N. Y. Supp.):

"The cases referred to, and many others which might be cited, establish the proposition that when the words 'heirs,' 'legal heirs,' or 'heirs at law' are used in a will for the purpose of designating the distributees of an estate composed entirely of personal property, and their meaning is not ambiguous, or changed or modified by the context or other parts of the instrument, they are equivalent to and mean 'next of kin'; and, unless otherwise provided, the statute of distribution determines the portion each distributee is entitled to take. But it is equally well established that it is the province and the duty of the court in each case to ascertain what the testator meant and intended when he used such words, and when so ascertained to give to such meaning and intent full force and effect; and also that such meaning may be learned from the words themselves, the context, the instrument considered as a whole, and all the circumstances surrounding each particular case. Courts will not substitute 'next of kin' for 'heirs' in a testator's will, and thereby create an entirely different class of persons as legatees, unless it appear that such substitution is necessary in order to make operative and effectual his intent."

In that case, however, it was apparent from an examination of the entire will together with a memorandum in testator's handwriting naming all of his heirs and indicating the proportion of his estate which each set of heirs would take, and from other extrinsic facts showing his relations with his heirs, that he there used the words "my heirs" to designate all his heirs, and not merely his next of kin.

In Lawton v. Corlies, 127 N. Y. 100, 27 N. E. 847, the testator, leaving both real and personal property, directed that his estate be divided among his "heirs at law" in accordance with the laws of the state of New York applicable to persons who die intestate. The court, construing this provision of the will, say (page 106, 127 N. Y., and page 848, 27 N. E.):

"The use of the words 'heirs at law' in such a connection indicates, as we think, the legal heirs, in the sense of persons who would legally succeed to the property in case of intestacy, according to its nature or quality, the heirs at law taking the realty and the next of kin the personalty. The cardinal idea seems to be that the division should be made in accordance with the statute in case of intestacy. This, as was said by the learned general term, seems to be 'the plain import of the language used by the testator,' * * * giving to the persons forming each of these classes whatever of the estate would go to them under the laws of the state. * * * As already suggested, there is nothing to indicate any other purpose."

This doctrine was applied in Cogan v. McCabe, 23 Misc. Rep. 740, 52 N. Y. Supp. 51, the court saying:

"The gift being only of the proceeds of the real estate when sold by the 'lawful heirs' of James Cogan, the testator must be held to have intended those of his kindred or blood who took by the statute of distribution."

We are of opinion that the facts of this case bring it within the general rule stated by the authors and in the decisions from which we have quoted. The use of the words "my heirs" in reference to the disposition of part of the remainder of the trust fund is not sufficient, in view of the other facts stated, to indicate an intention on the part of the testator that such fund should be distributed differently from the remainder of his personal property, as to which he died intestate. The will indicates that testator was not on terms of intimacy with any of his heirs, and that, if acquainted with them at all, he had no special interest in any of them. It would seem to follow that he could have had no particular intention concerning his heirs except to permit them to take and inherit according to the statutes of the state such of his property as he did not otherwise dispose of, and to take in the same manner the remainder of this fund after the fulfillment of the trust, for which sole purpose it was reserved from distribution to them with the greater part of his estate as to which he made no disposition. The statute of distribution governs, and the referee and surrogate therefore properly decided that the fourteen first cousins of testator took that part of the remainder of the trust fund thus bequeathed to his heirs. Upon the hearing before the surrogate on the coming in of the referee's report, the executor was placed upon the stand to testify with reference to the moneys received and paid out since the giving of his testimony before the referee, for the purpose of bringing the account down to the date of the decree to be made by the surrogate. On his cross-examination it developed that the testator was a lawyer, but that he had not practiced his profession for some years prior to his death. Thereupon, on motion of the attorney for some of the respondents, the court struck that testimony out, and exception was taken by appellant's attorney. Whether further evidence would be received at that time was discretionary with the surrogate. The matter had been fully tried out before the referee, whose findings were before the surrogate for confirmation. But, even if it were error to strike out the evidence, it is not sufficient ground for reversal. The mere 'fact that testator had been at one time a practicing attorney would not, under all of the facts of the case, lead to a different construction of the will and codicil.

It follows that the decree should be affirmed, with separate bills of costs, to all respondents appearing by separate counsel, and allowances to the special guardians to be made by the surrogate and payable out of the fund. All concur, except McLENNAN, J., not voting.