15 N.J. Super. 139 (1951)
83 A.2d 246
MAYFLOWER INDUSTRIES, A NEW JERSEY CORPORATION, PLAINTIFF,
v.
THOR CORPORATION, AN ILLINOIS CORPORATION, AND TELDISCO, INC., A NEW JERSEY CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided August 10, 1951.
*147 Messrs. Ruback, Albach & Weisman (Mr. Meyer E. Ruback and Mr. Joseph A. Weisman) and Mr. Alfred C. Clapp, for the plaintiff.
Mr. Thomas J. Brogan, for the defendant Thor Corporation.
Mr. Richard J. Fitz Maurice, for the defendant Teldisco, Inc.
FRANCIS, J.C.C. (temporarily assigned).
Plaintiff, Mayflower Industries, has moved for summary judgment in its favor on the "First Counterclaim" filed by the defendant, Thor Corporation, and on the counterclaim filed by the defendant, Teldisco, Inc.
*148 The grounds upon which the relief is sought are set forth in the notice of motion as follows:
(1) There is no genuine issue as to any material fact challenged, and that plaintiff is entitled to judgment as a matter of law;
(2) The counterclaims fail to state a claim upon which relief can be granted; or,
(3) That if dismissal is not granted on (1) or (2), then judgment should be entered in favor of the defendants on their respective counterclaims and against the plaintiff for nominal damages, namely, six cents.

I.

THE THOR COUNTERCLAIM.

A.

Liability.
The Thor counterclaim involved on this motion charges:
"Fortieth: That on or about March 20, 1950, the plaintiff maliciously and without probable cause, commenced this action against defendant, Thor Corporation, and a restraining order was obtained on the basis of a false and groundless claim of a distributorship contract for as long as Thor Corporation manufactures home appliances.
Forty-first: That said action and restraining order has caused and is causing defendant, Thor Corporation, great injury and damage in loss of business, profits and good will, and also in expenses of litigation, including attorneys' fees."
In the last letter supplement to the three briefs submitted by the plaintiff, the argument is made that the counterclaim is premature because the litigation charged to have been maliciously initiated and prosecuted, had not terminated at the time it was filed. It is the fact, of course, that the counterclaim was interposed in this very action which is the one alleged by the defendant to have been maliciously prosecuted. The weight of authority in this country, including New Jersey, is to the effect that the original proceeding must have terminated before an action for malicious prosecution can be instituted (Little v. Little, 4 N.J. Super. 352 *149 (App. Div. 1949); Shoemaker v. Shoemaker, 11 N.J. Super. 471 (App. Div. 1951); Kietrys v. Cregar, 23 N.J. Misc. 273 (Sup. Ct. 1945); Weisner v. Hansen, 81 N.J.L. 601 (E. & A. 1911); Potter v. Casterline, 41 N.J.L. 23 (Sup. Ct. 1879); Marsh & Vogel, New Jersey Practice Forms, § 377; Restatement of Torts, c. 30, § 674; 34 Am. Jur., Malicious Prosecution, § 41; Prosser on Torts, § 96, p. 867; 54 C.J.S., Malicious Prosecution, § 79, p. 1045), although there is some authority in support of the view that it may be done by way of counterclaim in the pending suit. Nerendeen v. Zey Realty Co., 75 N.Y. Supp.2d 836 (Sup. Ct. N.Y. 1947).
It may well be that under our present liberal practice rules. designed as they are in large measure to achieve the disposition of all actions between the parties in one litigation, the filing of such a counterclaim would be allowed but trial thereon withheld pending the disposition of the original action. Ciocca v. Hacker, 4 N.J. Super. 28 (App. Div. 1949); Shapiro v. Rice, 5 N.J. Super. 133 (App. Div. 1949). However, that problem need not be determined for reasons to be stated presently.
The counterclaim was recorded on April 11, 1951. No motion was made to dismiss it on the ground of prematurity. Plaintiff's action was dismissed with prejudice on May 28, 1951. So, aside from the fact that even on the present notice of motion prematurity is not set down as a reason for summary judgment, the state of the record now is that the original action has terminated. Accordingly, defendant's counterclaim should not be subjected to the summary disposition sought by the plaintiff, only to have the action immediately reinstituted as an independent suit.
In its own brief, defendant expresses some concern over the failure to allege in the counterclaim that the suit maliciously brought by the plaintiff had terminated in its favor. And it requests, under Rule 3:15, that if the court finds such allegation to be essential, an amendment be allowed to include it.
*150 Under our former practice, this allegation was indispensable. Kietrys v. Cregar, supra. Rigid pleading requirements were interred upon the birth of the new Rules of Civil Practice. Applying the more liberal approach, it is argued in effect that the allegation "without probable cause" connotes and encompasses a termination of the original action, favorable to the party seeking recovery for malicious prosecution. However, favorable termination is one of the essential elements of such a claim, and even the new rules have not dispensed with the need for alleging the conditions precedent to the existence of a particular cause of action. Grobart v. Society for Establishing Useful Manufacture, 2 N.J. 136 (1949).
Defendant refers to some instances outside of New Jersey where, in exceptional circumstances, the right of action was recognized even though the outcome of the original proceeding was adverse to the plaintiff in the malicious prosecution case. Without undertaking to differentiate them from a pleading standpoint or to declare them to be inconsistent with the holding of our appellate courts, it seems advisable at this time, and in view of the actual termination here of the original litigation, to require the allegation to appear in the counterclaim. Defendant's motion to add it by way of amendment will be granted.
Disposition of these matters makes necessary consideration of the more fundamental problems raised by the motion.
The counterclaim sounds in malicious prosecution. Defendant argues that it may, and in fact should, be looked at also as pleading a cause of action for unlawful interference with economic or business relations and for abuse of process. However, since the existence or non-existence of the cause of action is so centered about the good faith of the original action and the truth or falsity of the affidavit on which the ad interim restraint was granted, and because the only wrongdoing charged relates to the institution of the one action, the claim will be treated as one for malicious prosecution. In view of the conclusion reached herein that a factual issue is *151 presented on that claim, it does not appear to be necessary to deal with any other concept of wrongdoing charged against the plaintiff.
It may be said in passing that on the pleadings and affidavits now before the court, a case of abuse of process is not presented. Such a cause of action arises where process is perverted after its regular issue. Ash v. Cohn, 119 N.J.L. 54, 58 (E. & A. 1937); Hoppe v. Klopperich, 28 N.W.2d 780, 790 (Minn. Sup. Ct. 1947); Prosser on Torts, § 98; 1 Cooley on Torts (4th ed.), § 131, p. 437; Anno., 80 A.L.R. 580; Restatement-Torts, § 136(b), comment (c); 40 Harv. L. Rev. 502 (note).
So far as the case for malicious interference with business relations is concerned in the present situation, the basic proof requirements appear to be substantially the same as those needed to support the malicious prosecution counterclaim. Such an action seems to be regarded generally as one in the nature of malicious prosecution. Prosser on Torts, § 97, p. 888, § 1018-1019; Polo v. Edelbrau Brewery, 60 N.Y.S.2d 346, 185 Misc. 775 (N.Y. Sup. Ct. 1947).
Originally, no cause of action was recognized in the law for the wrongful institution of a civil action irrespective of the fact that it was brought maliciously and without probable cause. The recovery of costs by the defendant was considered sufficient redress. However, the inadequacy of this remedy asserted itself and as early as 1816 our Supreme Court established an exception to the doctrine. In Potts v. Imlay, 4 N.J.L. 382 (Sup. Ct. 1816), it was declared that an action for malicious prosecution could not be maintained for prosecuting a civil suit unless the defendant in that suit was "arrested without cause and deprived of his liberty or made to suffer other special grievance different from and superadded to the ordinary expense of a defense." This rule has never been changed or criticized and it still represents the law of this State. Bitz v. Meyer, 40 N.J.L. 252 (Sup. Ct. 1878); Schneider v. Mueller, 132 N.J.L. 163 (E. & A. 1944).
*152 Our courts have not been confronted with the need for particularizing the "special grievance" referred to. Cooley on Torts, after reviewing the cases on the subject in other jurisdictions, many of which refer to Potts v. Imlay as source material, says:
"So a suit for malicious prosecution will lie where the plaintiff's property or business has been interfered with by the appointment of a receiver, the granting of an injunction, by writ of replevin, by the filing of a lis pendens, or the preferment of charges against a police officer which results in his suspension from duty."
(Section 128; see also Restatement of Law of Torts, § 677; H.P. Rieger & Co. v. Knight, 128 Md. 189, 97 A. 358 (Ct. of App. 1916); Melvin v. Pence, 130 F.2d 423 (C.C.A.D.C. 1942); Peckham v. Union Finance Co., 48 F.2d 1016 (C.C.A.D.C. 1931); 34 Am. Jur. § 11).
There can be no reasonable disagreement with this statement. Plainly, an injunction which prevented Thor from conducting its business in a particular area and from using, enjoying and dealing with its property, constitutes a special grievance.
The action for malicious prosecution of a civil suit is governed by the same rules as those governing such an action arising out of a criminal prosecution. Prosser on Torts, § 97, p. 885. In order to succeed, it must appear (1) that the suit was brought without reasonable or probable cause; (2) that it was actuated by malice, and (3) that it has terminated favorably to the plaintiff in the malicious prosecution action. Shoemaker v. Shoemaker, supra. These elements must be established in addition to the special grievance already mentioned.
Malice in this connection means the intentional commission of a wrongful act without just cause or excuse. Brennan v. United Hatters, 73 N.J.L. 729 (E. & A. 1906); Kamm v. Flink, 113 N.J.L. 583 (E. & A. 1934).
In Brennan v. United Hatters, supra, Justice Pitney, for the court, said:
*153 * * * "But malice in the law means nothing more than the intentional doing of a wrongful act without justification or excuse. * * * And what is a wrongful act within the meaning of this definition? We answer, any act which in the ordinary course will infringe upon the rights of another to his damage is wrongful, except it be done in the exercise of an equal or superior right. In Mogul Steamship Co. v. McGregor, 23 Q.B. Div. 598-613, Lord Justice Bowen said: `Now, intentionally to do that which is calculated in the ordinary course of events to damage, and which does in fact damage another in that other person's property or trade, is actionable if done without just cause or excuse. Such intentional action, when done without just cause or excuse, is what the law calls a malicious wrong.'" (Pp. 744-745.)
Reasonable or probable cause for the institution of a civil suit is the presence of reasonable ground for belief that the cause of action exists supported by circumstances sufficient to warrant an ordinarily prudent man in the belief that it exists. Prosser, § 96, p. 871.
In approaching the problem presented by the motion for summary judgment in the light of the substantive principles alluded to, certain other considerations are important. In the first place, the law does not look with favor upon actions for malicious prosecution; it does not encourage them. The reason is imbedded deeply in our jurisprudence. The courts must be freely accessible to the people. Extreme care must be exercised so as to avoid the creation of a reluctance on their part to seek redress for civil or criminal wrongs for fear of being subjected to a damage suit if the action results adversely. Shoemaker v. Shoemaker, supra; Potts v. Imlay, supra, p. 384.
An illuminating statement of this attitude appears in Peckham v. Union Finance Co., supra:
"This doctrine is supported by the following considerations: The courts are open and free to all who have grievances and seek remedies therefor, and there should be no restraint upon a suitor, through fear of liability resulting from failure in his action, which would keep him from the courts. He ought not, in ordinary cases, to be subject to a suit for bringing an action, and be required to defend against the charge of malice and the want of probable cause. If an action may be maintained against a plaintiff for the malicious prosecution of a suit *154 without probable cause, why should not a right of action accrue against a defendant who defends without probable cause and with malice * * *."
In discussing the doctrine which requires proof of special grievance arising from the initiation of civil proceedings, Associate Justice Rutledge, speaking for the District of Columbia Court of Appeals in Melvin v. Pence, 130 F.2d 423-424 (C.C.A.D.C. 1942), said:
"The limitation is sound. When disputes reach the litigious stage, usually some malice is present on both sides. Friendly tort suits are not common. Nor is existence or want of probable cause always easy to determine until the event of the litigation is known. Some margin of safety in asserting rights, though they turn out to be groundless and their assertion accompanied by some degree of ill-will, must be maintained. Otherwise litigation would lead, not to an end of disputing, but to its beginning, and rights violated would go unredressed for fear of the danger of asserting them."
Further, as Cooley puts it:
"But to treat that as a legal wrong which consists merely in asserting a claim which cannot satisfactorily be established, would be plainly impolitic and unjust." (§ 115, p. 381.)
And also:
"If every suit may be retried on an allegation of malice, the evils would be intolerable, and the malice in a subsequent suit would be likely to be greater than the first." (1906 ed., p. 350.)
But "Access to the courts and other tribunals * * * should not be abused. The freedom to use their processes is not absolute. When malice motivates a groundless claim and results in special injury beyond what assertion of rights ordinarily entails, remedy is afforded. The right to litigate is not the right to become a nuisance. When the proceeding has no relation to protection of any right of the suitor or any public right which he reasonably may have a hand in vindicating, the reason for his protection fails and he must *155 respond." Melvin v. Pence, supra; Seffes v. Eaton, 152 F.2d 682 (U.S.C.A.D.C. 1945).
As Prosser puts it:
"But surely there is no policy in favor of vexatious suits known to be groundless, which are a real and often a serious injury; and the heavy burden of proof upon the plaintiff to establish both lack of probable cause and an improper purpose, should afford sufficient protection to the bona fide litigant and adequate safeguard against a series of actions." (§ 97, p. 886.)
In the second place, Rule 3:56-3 provides that summary judgment shall be granted only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show palpably that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."
The quoted language of this rule was taken from Federal Rule 56(c). Under the construction of the federal courts, this language was not designed "to cut litigants off from their right of trial by jury if they really have issues to try," and summary judgment should be granted only where "no genuine issue remains for trial." Chappell v. Goltsman, 186 F.2d 215 (C.C.A. 5th Cir. 1950). The matter cannot be decided on the affidavits of the parties where the facts are in dispute or where conflicting factual inferences may be drawn from them. Arnstein v. Porter, 154 F.2d 464 (C.C.A.2d Cir. 1946); Chappell v. Goltsman, supra. "Affidavits * * * are of value only when they indicate the non-existence of factual issues and they have no value when they attempt to resolve a factual issue in favor of one of the parties." Kaiser Co. v. Ric-Wil Co., 95 Fed. Supp. 54, 55 (D.C.N.D. Ohio 1950).
The appellate courts in the federal domain have constantly admonished the trial courts against weighing affidavits and deciding the credibility of witnesses in a proceeding seeking summary judgment.
For example, in Chappell v. Goltsman, supra, the court said:
*156 "It seems clear to us that the basis of the court's opinion was not that there were no genuine fact issues, but rather that there were such issues which it proceeded to decide adversely to appellants, although the motion raises questions of intent, unfair competition and perfidious dealings which ought not to have been disposed of by summary judgment and without trial on the merits."
And in Arnstein v. Porter, supra, the Court of Appeals for the Second Circuit said:
"We do not believe that, in a case in which the decision must turn on the reliability of witnesses, the Supreme Court, by authorizing summary judgments, intended to permit a `trial by affidavits,' if either party objects. That procedure which, so the historians tell us, began to be outmoded at common law in the 16th century, would, if now revived, often favor unduly the party with the more ingenious and better paid lawyer. Grave injustice might easily result."
In Bozant v. Bank of New York, 156 F.2d 787, (C.C.A.2d Cir. 1946), the court declared:
"In conclusion we cannot avoid observing that the case is another mistaken effort to save time by an attempt to dispose of a complicated state of facts on motion for summary judgment. This is especially true when the plaintiff must rely for his case on what he can draw out of the defendant. Arnstein v. Porter, 2d Cir. 154 F. (2) 464. It appears to be somewhat difficult to persuade the District courts of this, but we are satisfied that it is true."
Another court likewise observed:
"The district courts would do well to note that time has often been lost by reversals of summary judgments improperly entered." (Transcontinental Gas Pipe Line Corp. v. Borough of Milltown, 93 Fed. Supp. 283 U.S.D.C.N.J. 1950).
The opinions of the federal courts conform with the rule which was applied in New Jersey both before (Cross v. Margolis, 136 N.J.L. 453 (Sup. Ct. 1948); Scarano v. Scarano, 132 N.J. Eq. 362 (Ch. 1942); Federal Deposit Ins. Corp. v. Goodman, 31 A.2d 36 (Ch. 1942, not officially reported), affirmed 133 N.J. Eq. 64 (E. & A. 1942); Berger v. Interstate B. & L. Assn., 121 N.J.L. 507 (E. & A. 1939)), and *157 after Rule 3:56-3 was adopted, (Hodes v. Dunsky, 5 N.J. Super. 333 (App. Div. 1949); Geiger v. Metz, 11 N.J. Super. 134 (Law Div. 1950); Templeton v. Glen Rock, 11 N.J. Super. 1 (App. Div. 1950); Lionshead Lake v. Wayne Twp., 9 N.J. Super. 83 (App. Div. 1950)).
Reference to a portion of the opinion in Berger v. Interstate B. & L. Assn. seems appropriate:
"* * * Whether equivalent proofs would be admissible at the trial remains to be seen; we think that justice is not served by strict application of the rule to the situation which arises on a clash of affidavits, taken ex parte, in so informal a proceeding as a motion to strike. Evidence which is not available under our practice on the motion may be compelled by subpoena at the trial. It is the opportunity to go to trial and to put in her formal case for which the plaintiff is now contending. * * * We consider that the informality of the proceedings and the ex parte character of the proofs place the court in a less favorable position for striking a pleading because of factual insufficiency on preliminary motion than it would later occupy for granting a nonsuit or directing a verdict on a comparable showing of facts at the trial."
Also, in Cross v. Margolis, supra, the Supreme Court said:
"The legal points that have been raised with respect to the alleged agreement are not presently susceptible of determination until the entire facts are more fully elicited as the result of direct and cross-examination of witnesses."
The complaint filed by the plaintiff charges that late in November, 1944, the defendant, Thor Corporation, entered into an agreement under which the sole and exclusive right to distribute the products of the defendant in certain areas, was granted to it. The complaint also alleges that the contract was to remain
"in full force and effect so long as the defendant corporation would be engaged in the manufacture of home appliances and that the distributorship would only be terminable in the event good cause existed therefor, such good cause being more particularly defined in an earlier agreement between one The Morris S. Segal Corporation (a corporation substantially owned and controlled by the said Morris S. Segal) and the Meadows Corporation (a subsidiary of the defendant company) * * *."
*158 It further alleges that: in reliance upon this contract, plaintiff discontinued negotiations then pending for the distribution of the products of two other manufacturers and launched itself upon a widespread plan of promotion and sale of defendant's products; between the inception of the contract and the termination date, March 10, 1950, it purchased for distribution over $9,000,000 worth of merchandise; it procured hundreds of new dealers for defendant and became the largest distributor of defendant's products in the country; to stimulate such a large volume of business it expended "many hundreds of thousands of dollars"; in reliance upon the contract it built up a large organization with assets in excess of $500,000, with 90 per cent of this investment and of the plaintiff's time being devoted to purchase and sale of defendant's products; it entered into various long-term commitments, including "advertising, leasing and the like." In February, 1950, Morris S. Segal, the "real or beneficial owner of substantially all" of the issued stock of plaintiff, with the knowledge, consent and approval of defendant, upon which he relied, procured the purchase of a large warehouse and showroom building at a cost of $571,000, for ultimate use in the handling of defendant's products; in addition plaintiff, at the insistence of the defendant, purchased a "Parts Department" at a cost of $25,000 to be used as an aid in the performance of the distributorship contract, which "Parts Department" has always been operated at a loss.
The complaint further asserts that defendant had always manifested full satisfaction with plaintiff's operation under the contract until March 10, 1950, when without cause or notice the distributorship contract was terminated, effective immediately. No reason was given, no opportunity was afforded for discussion or negotiation and plaintiff was and is completely ignorant of the cause. As the result, the complaint recites, plaintiff's business is practically at a standstill; its entire staff, consisting of 60 persons, has lost most of its utility and plaintiff has been left with an enormous payroll and no business.
*159 Then the charge is made that the defendants, Thor and Teldisco, in pursuance of an "unlawful, wanton and malicious conspiracy" to injure the plaintiff in its business, entered into a contract under which Teldisco acquired plaintiff's distributorship; that Teldisco had full knowledge of the contract held by the plaintiff and aided and abetted in accomplishing the breach thereof; that pursuant to the new contract Teldisco is soliciting plaintiff's customers for the purpose of acquiring their patronage, and that unless Thor is enjoined from dealing with anyone but plaintiff, irreparable damage will result.
On the basis of all these allegations, plaintiff sought an injunction against Thor and damages against it and Teldisco.
The complaint was presented with the detailed supporting affidavit of Morris S. Segal and an ad interim restraint was granted restraining Thor from distributing its products except through the plaintiff in the area described in the complaint.
The defendant Thor filed a number of answering affidavits in opposition to the application for a preliminary injunction. However, on the adjourned return day of the order to show cause, before the matter was argued, the action was removed to the United States District Court for the District of New Jersey. The removal was predicated upon diversity of citizenship between plaintiff and Thor and upon the existence of a controversy between them separate and independent from that charged in the complaint against Teldisco.
In the District Court, a motion to remand was made and denied. On plaintiff's appeal to the Circuit Court of Appeals, 3 Cir., 184 F.2d 537 (1950), the denial was reversed and remand to the state court ordered on the ground of lack of federal jurisdiction, there being, in fact, no separate and independent cause of action pleaded against Thor. Certiorari was denied by the United States Supreme Court and so the action was restored to this court, Thor Corporation v. Mayflower Industries, 314 U.S. 903, 71 S.Ct. 610 (1951).
*160 By arrangement between the parties, a number of Thor's officers and witnesses were examined by the plaintiff in discovery proceedings. Also plaintiff was permitted to inspect certain of defendant's books and records. A controversy arose about the examination of some books and records. However, on application to the court, the difficulty was resolved.
Thereafter, defendant sought the deposition of Segal and the inspection of books and records of plaintiff corporation, as well as those of the Morris S. Segal Corporation, owned and controlled by Segal, which held the original contract with the Meadows Corporation and which now operates as a manufacturers' agent "for the sale of various appliances, furniture and other commodities," and of the Seamark Realty Co., the corporate holding company of Segal and his children, which acquired title to the Newark warehouse, said to have been purchased for use in connection with the handling of defendant's products. Plaintiff refused to permit this broad discovery and on application to the court by defendant, it indicated a willingness to permit inspection of its records so far as they related to the products manufactured by Thor, but it was unwilling to allow any further examination. At the argument of the motion, the court studied the list of records the defendant wished to examine, and without detailing here the reasons therefor, ruled that an order would be entered permitting such inspection. Thereupon, plaintiff announced its decision to dismiss the action and said further that the dismissal would be with prejudice if the defendants would take a like step with respect to their counterclaims. Defendants refused and plaintiff's suit was then dismissed with prejudice.
Now the defendant claims, in support of its counterclaim, that the allegations of the complaint and of the supporting affidavit of Segal, on which the ad interim restraint was granted, are false, that the action was instituted without probable cause, and since the plaintiff's suit has terminated favorably, its cause of action for malicious prosecution exists.
*161 Taking up first the question of the effect of the termination of plaintiff's action: Although the plaintiff abandoned the suit under the circumstances recited and although the dismissal was with prejudice, there was no actual determination on the merits. While some federal courts consider a dismissal with prejudice a determination on the merits (Olsen v. Muskegon Piston Ring Co., 117 F.2d 163 (C.C.A. 6th Cir. 1941); American Natl. Bank & Trust Co. v. U.S., 142 F.2d 571 (U.S.Ct. of A.D.C. 1944); and generally 149 A.L.R. 625), and our rule derives from the federal source, it seems most anomalous and in conflict with established notions of the doctrine of res adjudicata to declare that such a dismissal entered upon the abandonment of an action, constitutes an adjudication on the merits. In such a situation, the basic purpose of the rule would be served by regarding the dismissal as an absolute bar to the reinstitution of a suit for the same cause of action, rather than designating it as an adjudication on the merits. Thus, the effect as a preventive measure would be the same but basic concepts would not be violated. Such a view is in keeping with the language of Rule 3:41-1 and of Federal Rule 41(a) which is to the effect that such a dismissal "operates as an adjudication on the merits"; not that it is an adjudication on the merits. This may seem like a distinction without a difference but it serves to keep intact settled notions of res adjudicata.
In order to give significance to the term "with prejudice" as contemplated by Rules 3:41-1 and 3:41-2, it must import finality. It should be used sparingly and with caution but it should operate as a bar unless the trial court abuses its discretion. Tsibikas v. Morrof, 5 N.J. Super. 306 (App. Div. 1949); Home Owners Loan Corp. v. Huffman, 134 F.2d 314 (C.C.A. 8th Cir. 1943).
In any event here, an adjudication on the merits adverse to Mayflower is not a condition precedent to the maintenance of the counterclaim. A termination not adverse to Thor coupled with additional proof of lack of probable cause and of malicious institution of the suit, is sufficient. *162 Or a termination favorable to Thor, as in the present case (Restatement-Torts, § 674, comment on clause (b)), as distinguished from an actual decision on the merits, augmented by such additional proof, is sufficient. However, in New Jersey, now, even an actual determination on the merits against Mayflower, of itself has no probative force as evidence of want of probable cause. There must also be some independent proof of the other elements. In January, 1951, the Appellate Division, in Shoemaker v. Shoemaker, 11 N.J. Super. 471, so held and thus clarified and removed an apparent conflict in our cases on the subject.
As to whether Mayflower maliciously and without probable cause sued Thor, it must be kept in mind that usually direct evidence thereof is not obtainable and consequently the proof must be circumstantial in character. Prosser, § 96, p. 882. The intentional doing of the wrongful act constituting the element of malice and the reasonable belief in good faith in the cause of action, are conditions of the mind. What a person's intentions were need not be proved from what he said, but they may be inferred from all that he did and said, and from all the surrounding circumstances of the situation under investigation. Wilson v. State, 60 N.J.L. 171, 176 (E. & A. 1897); Van Houten v. State, 46 N.J.L. 18 (Sup. Ct. 1884). If there is evidence showing or tending to show that Mayflower had no actual belief that it had the cause of action pleaded (Potter v. Casterline, 41 N.J.L. 22 (Sup. Ct. 1879)), or showing or tending to show that the allegations of the complaint and supporting affidavit were false (Vladar v. Klopman, 89 N.J.L. 575 (E. & A. 1916); McFadden v. Lane, 71 N.J.L. 624 (E. & A. 1904); Navarino v. Dudrap, 66 N.J.L. 620 (E. & A. 1901)), a jury question is presented. And generally where the question of probable cause "depends, in part, at least upon facts the existence of which are in dispute, it is the function of the jury to settle those facts, and upon doing so, to determine whether or not probable cause has been shown * * *." Shoemaker v. Shoemaker, supra; Vladar v. Klopman, supra.
*163 At the outset of a consideration of the charge of falsity of Mayflower's complaint and Segal's supporting affidavit, it must be conceded that the distributorship contract asserted is a most unusual one. The claim that Edward N. Hurley, then chairman of the board of directors of Thor but now deceased, agreed, in its behalf, to give Mayflower a distributorship to continue so long as Thor "would be engaged in the manufacture of home appliances"  in effect a permanent distributorship  of itself excites an urge for close scrutiny. Doubt is cast upon its validity by affidavits which show that such a contract is opposed to the policy of Thor as established by the deceased Hurley; that the policy in November, 1944, was to grant distributorship terminable at will, with or without cause; that of the approximately 75 distributors appointed by it throughout the country, both before and since the alleged contract with Mayflower, not over five are not terminable at will and these few exceptions, all made since the death of Edward N. Hurley, are cancellable on 30 days' notice. The affidavits show also that the Thor policy conforms with the custom and practice in the industry generally, and a number of deponents, both distributors and persons connected directly with Thor, with many years of experience in the field, assert that they never heard of a contract such as that claimed by Mayflower.
Owen G. Nugent, now a vice-president of Thor, in his affidavit swears that at sometime in 1944 he was present in the office of Hurley when Segal was present and a discussion took place about a distributorship. Hurley told Segal about the postwar business plans, that the brands of washing machines sold by Segal for Meadows Corporation as manufacturer's agent before the war were to be discontinued and that he would be given an opportunity to see what he could do with a distributorship. The whole tenor of the conference was that he was being given the opportunity and he expressed himself as being delighted. The suggestion that Segal had to be persuaded to take the distributorship and given special inducements, is not true and nothing was said indicating *164 that the arrangement was to be any different from that made with other distributors.
At this time, Nugent said, defendant's business prospects appeared very bright because the cessation of production during the war had created a pent-up public demand in the laundry equipment field and there were many applicants for distributorships. In passing, it may be noted that the fact that there was a demand for this type consumer goods generally after the cessation of hostilities, is a matter of common knowledge.
Segal's affidavit clearly makes an effort to show that he was more sought after by Thor, than seeking. He says he had been negotiating with "two other washing machine manufacturers." But they are not named in any of his various affidavits, nor is there any proof submitted by them on his behalf. Further, the correspondence attached to his reply affidavit (Exhibits B, C and D) opposes rather than supports this position. Exhibit C, the letter of Edward N. Hurley to Segal, dated November 9, 1944, says plainly that he saw "no point in a trip to Chicago for you unless you have some other matters that would justify a social visit with me." Segal's reply (Exhibit D) indicates his feeling "that it is most imperative that I pay you a visit" and that "it is needless for me to tell you we are extremely anxious to operate with you." The letter shows no other business contemplated in Chicago, but this visit to Hurley. "I am looking forward to seeing you on Monday if I obtain reservations. I hope you will be at leisure because I will phone you soon after I arrive in Chicago." This letter also conveys the definite impression that he would be alone. The plant security records show that Segal did call, and alone, on November 27, 1944.
Nugent and other officers of Thor say that in the period of upwards of five years intervening between the alleged agreement and its termination, Segal never mentioned the permanent distributorship either orally or in any of their voluminous correspondence. It is worthy of notice also, that *165 Nugent's letter of February 15, 1945 (Exhibit E in Segal's reply affidavit), which specifically delineates the territory allocated and other matters, and which obviously was written when the relations were cordial, gives no hint or recognition of any such agreement.
In addition, Nugent's letter of March 3, 1950, to Segal (Exhibit F of the same affidavit) cancelling part of his territory, and particularly the last paragraph thereof, furnishes an inference that the defendant was in command of the situation. If, as alleged in the complaint, the permanent distributorship was to be subject to termination as provided by the original agreement with Meadows Corporation, plaintiff would have been entitled to six months' and 15 days' notice of the cancellation, which obviously was not given. (Exhibit H, par. 16, of affidavit of Raymond J. Hurley).
At this point, the allegation of the complaint with respect to termination of the permanent distributorship again comes to notice. It says cancellation was subject to the cause prescribed by the original Segal Corporation-Meadows Corporation agreement. However, in the supporting affidavit, Segal makes no mention of this important condition. Examination of paragraph 18 of this contract makes it unlikely in the extreme that the cause for termination set forth could be applied to the alleged new agreement. Under this old agreement, Segal's territory covered 13 states, with some counties eliminated from one of them. Zones were established and yearly quotas were assigned to them. If adequate business as assigned to the various zones was not produced, termination was in order. How this plan could be applied to the alleged new agreement, cannot be understood on the present record, voluminous as it is, and no explanation is offered.
In March, 1950, when the Mayflower distributorship was cancelled as Thor insists it had the right to do, since the agreement was terminable at will, with or without cause, Nugent says, and Segal concedes it to be true, that no statement was made about the existence of a permanent arrangement. Segal's explanation that Nugent "was so curt and *166 summary in his words and manner that I perceived in a moment that he was no longer my friend and that discussion with him would be futile," does not eliminate the conflicting adverse inference of which his conduct is susceptible.
Enough has been said to demonstrate that there is a serious and substantial factual dispute as to the existence of this unusual contract and as to the credibility of Segal on the subject.
In addition, Segal's credibility is challenged by affidavits further contradicting his statements in the affidavit supporting the complaint. Some of these contradictions deal with matters which must have been important considerations to the court in granting the ad interim restraint.
For example, in the complaint it is alleged that on February 1, 1950, Segal, with the consent and approval of Thor, "procured the purchase of a large warehouse and showroom in Newark, N.J., at a cost of $571,000" for the purpose of ultimate use in sale, warehousing and distribution of defendant's products. In his affidavit, he said, "I purchased the building for $571,000 for the purpose of setting up a large showroom and warehouse for sale of Thor products; this was the sole and real purpose." "Title was taken" in the name of a family holding company. In the middle of a long paragraph in the affidavit, this appears: "The building is presently occupied by a tenant."
Documentary proof was submitted by defendant in support of its contention that these statements were in part false, disingenuous and misleading. Officers of defendant swear that Segal mentioned the purchase of a warehouse after it had been accomplished. It appears that the building was and is leased to Western Electric Company at an annual rental of $60,000, and that the lease will not expire until February 14, 1954. The cost of $571,000 actually was a cash payment of $130,000, the remainder being represented by a mortgage then on the premises and which Segal's holding company did not assume.
*167 Further, in the press release supplied by Segal on February 11, 1950, this statement appears: "Mr. Segal plans extensive alterations to the building for occupancy by Mayflower Industries, which now has offices and showrooms in various parts of the country for its wholesale distribution of appliances and furniture." No reference was made to Thor nor to Segal's affirmation here that the sole purpose of the purchase was to facilitate the Thor distributorship.
Moreover, on February 1, 1950, the very day the warehouse deed was recorded and one day after its execution, Segal wrote John R. Hurley, president of Thor, and sent a copy of the letter to Nugent, saying among other things:
"You no doubt heard, John, that we are making large plans to move our Mayflower Appliance Division out of our present quarters. We have options on two spaces now. We do not know which we will choose. One has 16,000 feet and the other is two floors, meaning for show rooms and office space for appliances. We intend to have one of the finest set-ups of its kind in our immediate vicinity. * * *"
Nothing said here about the warehouse or the fact that these quarters would simply be temporary until the new warehouse show-rooms became available.
As set forth above, the complaint alleges that plaintiff spent "many hundreds of thousands of dollars" for advertising and promotion expenses. In the supporting affidavit, Segal put this sum as in excess of $350,000, and he stated further that his company made an unusual showing in 1949, a marked recession year in the home appliance field, only because of "terrific effort" and "without sparing any expense for advertising and other publicity."
In response, Nugent's affidavit recites that under the Thor advertising plan for its distributors, it would match "every dollar spent by a distributor with dealers in advertising, with a dollar of its own up to one per cent of its billings to the distributor." In 1949, Mayflower did not do the amount of advertising required to obtain this one per cent. A balance of $17,521.85 was not used because Segal did not do enough advertising to avail his company of it. By way of contrast, *168 another large distributor, E.B. Latham & Co., during the same year, "spent so much in advertising that there was left only $3,652.50 not used by them." Nugent says also that prior to 1949, the public demand exceeded the supply of household appliances; there was no need for extensive advertising and during this period Mayflower never spent enough so that it could take advantage of the full sum available to it under the Thor plan.
In a later affidavit of an accountant for plaintiff, an error of $88,000 in this alleged advertising expenditure was admitted and it was claimed that of $262,000 spent for advertising, 90 per cent is attributable to the Thor operation. But no details as to this were made available.
In this connection, there is noted also in a letter of Segal to Thor, dated November 18, 1948, a reference to the need for protecting the markets "that have been built up as the result of your tremendous powerful advertising and sales promotion activities of the past few years."
The complaint asserted that at the insistence of defendant, plaintiff purchased a "Parts Department" at a cost of $25,000 to be used as an aid in the operation of the distributorship; and further, that the department had always operated at a loss. The Nugent affidavit sets forth that Thor's records show this purchase, in which it was the seller, actually cost Mayflower $8,147.10 for parts and $1,700 for office mechanical equipment, furniture and fixtures, or a total of $9,847.10. With respect to the claimed operating loss, the charge is made that the "loss" is due to plaintiff's accounting methods and that when Thor offered to take the department off Segal's hands, he ceased discussion of the matter.
One additional conflict should be mentioned. As set forth, the complaint and affidavit of Segal claim 90 per cent of its facilities, efforts and employees, approximately 60 in number, were devoted to the Thor distributorship, and that cancellation of the contract left Mayflower "practically moribund," with a heavy payroll. On the other hand, Thor insists that plaintiff had no more than 35 persons engaged in handling *169 its appliances, as well as other lines such as electric refrigerators, electric and gas ranges, television and other products. And with respect to the payroll, Thor says that Mayflower's own employees had given the information that they were working on a straight commission basis. This is unlike the operation of its other distributors.
Numerous other specific factual disputes are created by the various sworn statements. Generally speaking, they relate to plaintiff's assertions about dealers and customers lists, their creation and use, the extent of Segal's activities in the furniture field, the extent of plaintiff's investment to operate the distributorship, the claimed absence of "consumer acceptance" of Thor products before the war, the sales results obtained by plaintiff, Teldisco's knowledge of plaintiff's permanent distributorship contract, the existence of an "unlawful, wanton and malicious conspiracy" to injure the plaintiff, and particularly to the assertions about plaintiff's ignorance of the existence of reasons for the cancellation and his total surprise when it took place.
The many, substantial factual conflicts, viewed against a background of the unusual nature of plaintiff's claimed distributorship, and the sudden and likewise unusual abandonment of its suit after a year of bitter litigation, at a time when the defendant was about to enter upon discovery proceedings and the inspection of plaintiff's books and records, lead inevitably to the conclusion that determination of the cause must await full disclosure at final hearing.
It does not seem to be seriously disputed that Mayflower did over $9,000,000 worth of business with Thor during the existence of the distributorship. Plaintiff's profits are not disclosed but undoubtedly they were substantial. If it had, or in good faith believed it had, a permanent distributorship, the damage suffered by reason of an unlawful breach thereof, on the record presently before the court, would be of sizeable proportions. Suffering a dismissal with prejudice in such a case leaves open inferences opposed not only to the existence of the cause of action but to plaintiff's good faith *170 and credibility in presenting it as well. Did the plaintiff actually have a cause of action for breach of contract, or did it, in good faith and as a reasonable person, believe that it had such a cause of action? Or did it, through anger and ill will, at the termination of the distributorship, with conscious falsity, claim that it had a permanent distributorship? And did it, maliciously and with intent to injure defendant in its business, institute the suit and seek and obtain an ad interim restraint? Credibility is a major issue here. Such an issue can only be determined by seeing and hearing the various witnesses. As the federal court said in Colby v. Klune, 178 F.2d 872 (C.C.A.2d Cir. 1949):
"For the credibility of the persons who here made the affidavits is to be tested when they testify at a trial. Particularly where, as here, the facts are peculiarly in the knowledge of defendants or their witnesses, should the plaintiff have the opportunity to impeach them at a trial; and their demeanor may be the most effective impeachment. Indeed, it has been said that a witness' demeanor is a kind of `real evidence'; obviously such `real evidence' cannot be included in affidavits."
This excerpt seems quite applicable here, particularly since the person who is said to have made the agreement is now dead.
The record submitted shows that after defendant's answering affidavits had been submitted, plaintiff filed an affidavit of his brother, Jule E. Segal, in which the affirmation is made that Jule was present in defendant's Chicago office when the distributorship contract was entered into, and heard all the details. However, defendant's counter documentary proofs and affidavits suggest most strongly that he was not and could not have been there. In fact, this contradiction is so strong that in its briefs and memoranda plaintiff makes no reference to Jule's affidavit. Defendant maintains that Morris Segal, on behalf of plaintiff, knowingly made a false claim and then sought to support it with a knowingly false affidavit of his brother. On this motion, the conflict is entitled to consideration along with all of the other factual problems already detailed.
*171 Plaintiff contends that regardless of the existence of this factual dispute, it should have judgment because defendant is estopped from asserting a claim for malicious prosecution under the doctrine of Schneider v. Mueller, 132 N.J.L. 163 (E. & A. 1944). In that action, which was for malicious prosecution, defendant had filed a bill of complaint and obtained an ad interim restraint against the plaintiff. The order to show cause containing the restraint was made returnable 18 days later and contained a provision permitting application for modification thereof on five days' notice. A few days after the restraint was issued and after service thereof on Schneider, and after consultation with counsel, he went to Mississippi, where he remained for over six months. About seven weeks after returning to New Jersey, he moved to vacate the restraint and to dismiss the bill. Then, by consent of the parties, such an order was entered. In the subsequent malicious prosecution suit, Schneider contended that the allegations of the bill in the Chancery suit were false. His action was non-suited and the trial court was affirmed on appeal, the Court of Errors and Appeals saying:
"There was a restraint which was subject to challenge on five days' notice by the express provision of the restraining order itself, but the plaintiff in this case took no steps to challenge the bill or dissolve the restraint. Instead, by conduct, he acquiesced since he left the state to take other employment and took no steps to disturb the status quo for seven months thereafter. It is charged in the complaint that because of the `malicious and groundless acts' of the defendant the plaintiff lost his entire investment but there is no proof that the plaintiff's investment loss was caused by the action which the defendant instituted in the Court of Chancery."
Plaintiff points out that Thor could have moved in the Chancery Division for dissolution of the restraint on two days' notice but failed to do so. Instead, voluminous opposing affidavits were filed and then, on the day fixed for argument the cause was removed to the Federal District Court where it remained until April 18, 1951, when it was remanded for lack of jurisdiction. So Mayflower urges that Thor must be deemed to have acquiesced in the restraint and consequently *172 barred from relief. However, the situations are not comparable. Thor did not acquiesce in the restraint imposed; it did not sit idly by as Schneider did. Following the removal to the federal court, it applied for vacation of the restraint and the plaintiff moved to remand the action to our court. After lengthy argument and consideration of briefs, the District Court decided to dismiss the restraint and to deny the remand. Then it agreed to reinstate the restraint pending appeal, providing the plaintiff posted a $50,000 bond. When this was done, the restraint was continued. The differences in the two cases are so marked, that Schneider v. Mueller on the record presented cannot be considered controlling.
A final contention is made that the affidavits of Mayflower demonstrate the bringing of the action on the advice of counsel. Such advice is a defense only where all the facts are submitted fully and truthfully to counsel. Dombroski v. Metropolitan Life Ins. Co., 18 N.J. Misc. 240, affirmed 126 N.J.L. 545 (E. & A. 1941). In view of the factual dispute already adverted to, whether the plaintiff did this is for determination at final hearing. Bencke v. Weltersbach, 108 N.J.L. 430 (Sup. Ct. 1932).
Under all of the circumstances, the motion for summary judgment in favor of the plaintiff on the liability aspect of the case is denied and the counterclaim is held for trial.

B.

Damages.
Plaintiff's notice of motion gives as its final ground for summary judgment, that even if a factual issue of liability is presented, a judgment in favor of the defendant Thor and against it should be entered in the amount of six cents. It will be observed that the motion does not seek an order limiting the recovery to six cents in the event of the defendant's success on the counterclaim. On the contrary, it affirmatively asks that judgment be entered in favor of the defendant in that amount.
*173 The theory upon which this action is sought is that since the restraint only prevented the defendant from doing business with any one other than the plaintiff and since the plaintiff was ready and willing to continue to act as distributor pending final hearing on the complaint, any damage suffered through refusal to deal with it was self-inflicted. The argument is not persuasive. The defendant claims that under the agreement it could terminate their relationship with or without cause, and that it stood on both alternatives in doing so. It says that even if cause was necessary, cause existed. If this claim represents the fact, the distributorship was ended justifiably and there was no obligation to continue dealing with Mayflower, and if Mayflower chose maliciously and without probable cause to prosecute an action for breach of contract, Thor was entitled to stand its ground and undertake to establish its own paramount right.
This point was argued in plaintiff's original brief. However, in the reply brief it shifted ground and urged that if liability exists for any period of the restraint, the time spent in the federal courts should be eliminated as an element of damage by a partial summary judgment under Rule 3:56-4. The argument is that defendant, by its own voluntary act, removed the action to the United States District Court which, as it ultimately developed, never had jurisdiction. Therefore, any delay occasioned thereby in meeting plaintiff's claim and the ad interim restraint, cannot be charged to the plaintiff.
This contention was not set down as one of the grounds in the notice of motion served upon defendant. However, no objection was raised on this score and the matter was fully met on the merits in defendant's brief. Consequently, the technical insufficiency of the notice will be disregarded.
There is nothing here to indicate or even suggest that defendant or its attorneys did not exercise the utmost good faith in the removal proceedings. Nor is there anything now adduced to justify the conclusion that there was no basis for belief that federal jurisdiction existed. The record shows that *174 jurisdiction was denied in the Circuit Court of Appeals by a divided court and that each of the three judges filed a separate opinion. The result of the determination, however, is that defendant was mistaken as a matter of law in believing the cause to be within the ambit of the federal court and in acting upon that belief. Should the time lost in litigating that problem be carved out of the period of existence of the restraint in determining the quantum of damage suffered by the defendant?
This is a tort action and if the right of action is established, the damages recoverable would be those which proximately flowed from the plaintiff's wrongdoing. Of course, if any independent, culpable agency intervened between the tortfeasor's act and all or some of damage, the recovery would be reduced accordingly. Whether the conduct of counsel in advising the defendant to remove the action to the federal court, constitutes such a culpable agency, is a factual question which is not presently capable of determination. This must await the development of the full facts at the trial. It seems sufficient at this time to pose the problem: If a wrongdoer, who willfully injures another, is liable for the full consequences which flow to the injured person, even though the consequences are aggravated by a mistake of an attending physician (chosen with reasonable care), should plaintiff be relieved in this case of part of the damages consequent upon its wrongdoing, because acting on advice of competent counsel, which advice turned out on appeal to be erroneous, defendant caused the removal of the proceedings to another jurisdiction and thus lengthened the period of the restraint?
Is the liability of the wrongdoer any different because a physician is an independent contractor and an attorney is the agent of the client, where the attorney acted in good faith and was guilty of no negligence?
One further problem of damages requires attention. Plaintiff also seeks a judgment eliminating from the counterclaim the demand for recovery of costs and counsel fees incurred *175 in defending the alleged maliciously prosecuted action. This request is predicated on Cook v. Chapman, 41 N.J. Eq. 152 (Ch. 1886), where costs and counsel fees were allowed following the dismissal of an injunction wrongfully obtained. However, Vice-Chancellor Van Fleet granted the allowances because an injunction bond had been posted and declared forfeited, and he said that in the absence of such a bond, "as a general rule" the right to them would not exist.
The present case is a damage suit for malicious prosecution. It is not an application for counsel fees in the original injunction proceeding. If it were, in the absence of a bond, our Rule 3:54-7 would bar any such allowances. Under ordinary circumstances, an action for malicious prosecution would be cognizable in the Law Division of the Superior Court. If the Thor and Teldisco counterclaims had been instituted as independent claims, they would have been brought in that Division. However, they are proper counterclaims to the primary suit and even though that action has been dismissed, thus leaving only the two damage counterclaims for consideration, the Chancery Division cannot transfer them.
In Steiner v. Stein, 2 N.J. 367 (1949), Chief Justice Vanderbilt said:
"Where an action is brought which in the first instance is cognizable in the Chancery Division, it should be retained in that division irrespective of the fact that before or during the trial the equitable phases of the cause have been fully disposed of, leaving only purely legal issues remaining for determination."
In malicious prosecution cases the well nigh universal rule is that reasonable costs and counsel fees incurred in defending the action maliciously brought, are an element of damage.
There appear to be no cases in New Jersey where the point was raised on appeal. However, it seems safe to say that in the law courts it is common practice to receive such proof, and the absence of declaration on the subject from our appellate *176 courts attests the recognition and acceptance by the bar of the practice as sound.
Reference to other jurisdictions and texts will disclose the common acceptance of the rule that such costs are recoverable. Polo v. Edelbrau Brewery, 60 N.Y.S.2d 346, 185 Misc. 775 (N.Y. Sup. Ct. 1947); Cooper v. Weisblatt, 277 N.Y.S. 709, 154 Misc. 522 (N.Y. Sup. Ct. 1935); Worden v. Davis, 195 N.Y. 391, 88 N.E. 745 (Ct. of App. 1909); Sheldon v. Carpenter, 4 N.Y. 579 (Ct. of App. 1851); Wheeler v. Hansen, 161 Mass. 320, 37 N.E. 382 (Sup. Ct. 1894); O'Neill v. Johnson, 53 Minn. 439, 55 N.W. 601 (Sup. Ct. 1893); McIntosh v. Wales, 21 Wyo. 397, 134 Pac. 274 (Sup. Ct. 1913); Slater v. Kimbro, 91 Ga. 217, 18 S.E. 296 (Sup. Ct. 1892); Bernstein v. Simon, 77 Colo. 193, 235 P. 375 (Sup. Ct. 1925); Stevens v. Chisholm, 179 Cal. 557, 178 P. 128 (Sup. Ct. 1919); Wren v. Rehfeld, 37 S.D. 201, 157 N.W. 323 (Sup. Ct. 1916); Krug v. Ward, 77 Ill. 603 (Sup. Ct. 1875); Harr v. Ward, 73 Ark. 437, 84 S.W. 496 (Sup. Ct. 1904); Walker v. Pittman, 108 Ind. 341, 9 N.E. 175 (Sup. Ct. 1886); Mitchell v. Davis, 51 Minn. 168, 53 N.W. 363 (Sup. Ct. 1892); Sedgwick on Damages (9th ed.), vol. 2, § 459, p. 887; 24 Am. Jur. 762, § 86; Restatement of Torts, § 681.
In the face of the wealth of authority on the subject, the application for partial summary judgment on this ground must be denied.

II.

THE TELDISCO COUNTERCLAIM
The Teldisco counterclaim, filed May 3, 1950, alleges that on March 21, 1950, it executed a proposed contract under which it was to become the Thor distributor in northern New Jersey. However, the contract was never signed by Thor because Mayflower obtained the ad interim restraint already referred to. It then alleges that by reason of the restraint, it has been unable to receive the benefits of the *177 contract and Thor has been prevented from delivering products to it for sale; the best season of the year for sale of such products is from March through June, and by reason of the restraint, it is sustaining a gross profit loss of $15,000 monthly. Therefore, it seeks damages in the amount of $100,000.
It will be noted that no allegation is made that the restraint was obtained on a false affidavit, that the suit against Teldisco and Thor was brought maliciously and without probable cause, or that the action against it constituted any kind of tortious act.
In opposition to the motion for summary judgment, Teldisco argues, citing 28 Am. Jur., § 335, that one not a party to an injunction suit may recover "from the injunction plaintiff for injuries resulting to him from the wrongful injunction, without alleging any malice or want of probable cause * * *." However, the counterclaim here does not even charge that the restraint was wrongful.
The further contention is advanced that the plaintiff's action constitutes a "wrongful and unjustifiable interference" with the contractual relationship existing between it and Thor. And in the brief, reliance is placed upon Kamm v. Flink, supra; Brennan v. United Hatters, supra, and Schlesinger v. Rice, 4 N.J. 169 (1950). Here again no allegations are found in the counterclaim to support such a cause of action.
Under the circumstances, no claim for relief is set forth. However, in view of the arguments submitted in the brief, this defendant will be allowed two weeks from the date hereof to amend so as to plead the claim it intends to try. Otherwise adverse summary judgment will be entered. If the amendment is made, the plaintiff's motion may be renewed so that there will be a definite disposition of the matter on the merits.