**HAMMOND LEAD PRODUCTS, INC., and Gary R. Mitchener, Plaintiffs-Counterdefendants, Appellees and Cross Appellants,**

v.

**AMERICAN CYANAMID COMPANY, Defendant-Counterplaintiff, Appellant and Cross Appellee.**

**Nos. 77–1663 through 77–1667.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1977.

Decided December 16, 1977.

As Amended Dec. 19, 1977.

Rehearing Denied Jan. 11, 1978.

Bernard E. Harrold, Stephen M. Greenberg, Newark, N. J., Harold W. Huff, Chicago, Ill., for defendant-counterplaintiff, appellant and cross appellee.

Kenneth D. Reed, Harold Abrahamson, Hammond, Ind., for plaintiffs-counterdefendants, appellees and cross appellants.

Before CASTLE, Senior Circuit Judge, WOOD, Circuit Judge, and WYZANSKI, Senior District Judge.*

WYZANSKI, Senior District Judge.

American Cyanamid Company appeals from (1) a judgment awarding Gary R. Mitchener $200,000.00 compensatory damages and $300,000.00 punitive damages on his claim of malicious prosecution; (2) a judgment against American in favor of Mitchener on American's counterclaim; (3) a judgment against American in favor of Hammond Lead Products, Inc. for $78,-300.00 for compensatory damages and $200,000.00 punitive damages on its claim for malicious prosecution; and (4) a judgment against American in favor of Hammond on American's counterclaim.

The aforesaid judgments resulted from the consolidation of two separate actions

---

* The Hon. Charles E. Wyzanski, Jr., Senior District Judge of the District of Massachusetts, is sitting by designation.

heard in the district court for the Northern District of Indiana. The first judgment on Mitchener's claim was tried to a jury; but both of American's counterclaims and Hammond's claim against American were tried by the court.

On April 17, 1974 Hammond filed suit against American alleging, *inter alia,* malicious prosecution; American filed a counterclaim seeking, *inter alia,* damages caused by Hammond's use of wrongfully obtained confidential information.

On September 23, 1974 Mitchener filed suit against American alleging, *inter alia,* malicious prosecution; and American filed a counterclaim seeking damages for wrongful use of confidential information.

After the two actions were consolidated, the court and jury heard evidence to the following effect.

In 1968 Mitchener was employed at General Cable Company to test in the laboratory stabilizers offered to that company for purchase. While so employed, he had learned to use a Braebender Rhoeometer to test lead stabilizers. Howard Morgan, President of MacGregor Lead Company, at the suggestion of Wayne Anderson, doing business as Wayne Anderson & Co., the largest independent sales representative of MacGregor, induced Mitchener to leave General Cable to become an employee of MacGregor in its quality control testing laboratory which required the services of a person able to operate a Braebender Rheometer. MacGregor doubled Mitchener's salary and bought a Braebender Rheometer for him to operate.

In July, 1970 Morgan having retired as President and Beil having succeeded him as President of MacGregor, that corporation entered into an agreement to sell its assets to American. At that time, American employed no lead chemists and had never manufactured or sold lead chemicals.

A lengthy, complicated, detailed Assets Purchase Agreement was entered into May 24, 1971 and was executed June 1, 1971 between MacGregor and American. The text and the exhibits annexed to it itemize each asset, real and personal, tangible and intangible covered by the contract. Nowhere is there any reference to any trade secrets or proprietary information or confidential information.

The Assets Purchase Agreement called for the termination of all MacGregor's employees except Beil.

When purchasing, American did not explicitly offer a job to Mitchener nor consult him about his willingness to become an American employee. Nonetheless, he did, in the first week of June, attend a meeting of American salesmen to inform them about lead stabilizers. In the middle of the same month, he received from American its check to pay his salary. He accepted the check and on June 16, 1971 resigned. The resignation was accepted by American without reservation or restriction.

Anderson, having learned from trade journals that American had taken over MacGregor and planned to use its own salesmen to sell lead stabilizers to Anderson's customers, met with American officials. Anderson agreed to stay for a few months as representative of American until American's salesmen could take over sales operations. Thereafter, Anderson began to look for a new source of lead stabilizers to supply Anderson's customers. He found Hammond Lead Products, Inc., headed by Wilke, willing to expand its stabilizer line so as to fill the needs of Anderson's customers. Since he and Wilke recognized that Hammond would need a laboratory for quality control testing, Anderson suggested for that laboratory's head several people— including Mitchener. Wilke discussed the suggestions with Morgan who endorsed Mitchener. Hammond then employed Mitchener at a salary of $17,000.00 a year— an increase of $2,000.00 over his salary at MacGregor.

On June 22, Schmidlein of American wrote Hammond objecting to the employment of Mitchener on the ground that he had trade secrets and proprietary information. Thereupon, Wilke interviewed Mitchener, who denied having any trade secrets or proprietary information and said that

everything he needed to know to run Hammond's laboratory he had learned at General Cable. Wilke then consulted Morgan, who said that there were no trade secrets nor proprietary, confidential information concerned with lead stabilizers which Mitchener had learned at MacGregor. In effect, the same information was given to Wilke by Anderson. Thereafter, Wilke informed American that Hammond was going to continue Mitchener's employment and expand its line of stabilizers to compete with MacGregor.

For sixteen and a half months American did nothing.

Hammond expanded its stabilizer line and apparently successfully competed with American.

Leaving Indiana, Mitchener on December 4, 1972 arrived in Atlantic City, New Jersey for his annual trip to the Wire and Cable Symposium. On that day, American filed in Newark, New Jersey, in the district court, a complaint against Mitchener and against Hammond. The complaint alleged that Mitchener knew trade secrets of MacGregor, that American had purchased these trade secrets from MacGregor, that Hammond had lured Mitchener from American, and that Mitchener and Hammond were unlawfully using trade secrets which belonged to American as a result of its purchase from MacGregor. American sought an injunction and damages.

American persuaded the district judge in New Jersey to authorize American's attorneys to serve on Mitchener individually and as agent for Hammond the complaint and a summons ordering and scheduling a deposition of Mitchener and a representative of Hammond to occur in New Jersey on December 8—later changed to December 18.

Attorneys for Mitchener and Hammond filed in the district court of New Jersey motions challenging venue and jurisdiction on the grounds that the transactions referred to in the complaint occurred in Indiana and Illinois, that Mitchener was a resident of and Hammond was a corporation organized under the laws of Indiana, and that the only contact in New Jersey was

that in that state American, a Maine corporation, had its main office. Mitchener and Hammond asked that the suit be dismissed or transferred to Indiana or Illinois. The district judge denied both motions and permitted discovery to be pursued by American. An appeal was taken to the United States Court of Appeals for the Third Circuit sitting in Philadelphia. That court on April 15, 1974 reversed the district judge and ordered the cause dismissed on the ground that a Maine corporation could not properly bring a diversity action in New Jersey against an Indiana resident and an Indiana corporation on a cause of action arising out of transactions in Indiana and Illinois.

On April 17, 1974 Hammond filed against American the complaint which resulted in the third and fourth of the judgments referred to at the outset of this opinion. Hammond's complaint alleged, *inter alia,* that American had damaged Hammond by maliciously prosecuting Hammond by bringing the New Jersey litigation in the manner and at the time and place where it was brought.

Several months later, Mitchener filed a parallel complaint against American in the state court in the Northern District of Indiana. American removed that case to the United States District Court for the Northern District of Indiana. Subsequently, that case, which resulted in the first and second judgments to which reference was made at the outset of this opinion was consolidated for trial with the complaint Hammond had filed against American on April 17, 1974. In May, 1974 Hammond applied to the United States District Court for the Northern District of Indiana for an injunction preventing American from bringing in other jurisdictions further actions against Hammond involving the same parties and subject matter. The district judge held a hearing and announced from the bench that he intended to issue such an injunction despite American's protestations that it had no intention of bringing such an action.

Without informing the district judge in Indiana, American, on the very afternoon

of the hearing before him, but not until 4:45 p.m., filed a second suit in the United States District Court in New Jersey against Hammond. Not knowing of this second New Jersey suit, the Indiana Federal judge entered on the next day an injunction against American forbidding it to bring such suits.

In the meantime, in answers filed both to the *Hammond* complaint and the *Mitchener* complaint, American made against each of them counterclaims which, in effect, repeated the allegations which American had made in the first litigation which it had begun in the United States District Court for the District of New Jersey in 1972.

The trial of the consolidated cases began in South Bend, Indiana on January 17, 1977. In the *Mitchener* case, on January 25, 1977, the jury returned, *inter alia,* verdicts for Mitchener against American on the malicious prosecution claims for $200,000.00 on account of compensatory damages and $300,000.00 on account of punitive damages. On May 20, 1977 in the *Mitchener* case the United States District Court in Indiana entered judgment in favor of Mitchener against American in the amount of $500,000.00 on the complaint and entered judgment against American in favor of Mitchener on American's counterclaim, but failed to enter findings of fact and conclusions of law with respect to that counterclaim.

In the *Hammond* case on May 20, 1977 the United States District Court in Indiana entered findings of fact and conclusions of law, and on the same day entered judgment in favor of Hammond and against American on Hammond's malicious prosecution claim for $78,300.00 compensatory damages and $200,000.00 punitive damages. The court on May 31, 1977 entered judgment against American in favor of Hammond on American's counterclaim.

The district court's careful findings of fact are set forth in 49 paragraphs which cover 36 pages of the record transmitted to us; and its conclusions of law, equally carefully prepared, are set forth in 10 paragraphs occupying 4 more pages of the record.

We are satisfied that these findings of fact are supported by substantial evidence and furnish an adequate basis for not merely the judgment entered by the lower court with respect to Hammond's complaint, but also its judgments with respect to American's counterclaims against both Hammond and Mitchener. Furthermore, the lower court's findings constitute an analysis of the evidence which was before not only the judge but the jury and sustain the verdicts returned by the jury with respect to the malicious prosecution claim.

Moreover, the lower court's findings of fact and conclusions of law warrant that court in setting aside the verdict of the jury as to those parts of the complaint of Mitchener which allege abuse of process. We agree with the lower court that the evidence to support the abuse of process verdict was substantially the same as that to support the verdict for malicious prosecution.

In affirming the district court, we see no reason to retread the path which the district judge hewed so well in his findings of fact and conclusions of law. But we may briefly say that we find ample support for the verdicts of the jury and for the findings of fact and conclusions of law of the trial judge. If Mitchener had any confidential information such as trade secrets or know-how, he gained that knowledge while in the employ of General Cable Company. MacGregor Lead Company was never in a position to sell, nor did it purport to sell, that knowledge to American Cyanamid Company. American Cyanamid Company was well aware that it had no property or other right to such knowledge. Solely with the malevolent purposes of injuring a competitor and interfering with the advantageous contractual relationship between Mitchener and Hammond Lead Products, Inc., and with no expectation that it could prevail on the merits, but merely to harass a competitor, American brought in bad faith an action in the United States District Court in New Jersey where American hoped that the cost of defense away from their homes and offices would lead Mitchen-

er and Hammond to settle a groundless claim. American deserved to be penalized by heavy punitive damages for its outrageous conduct.

Nor are we impressed by defendant American's argument that it is not liable for a tort of malicious prosecution because plaintiffs cannot show that when sued by defendant they had prevailed on the merits.

An action for wrongful use of civil proceedings—or, as it is commonly, if inaccurately, denominated, an action for malicious prosecution does not fall entirely within the classic formulation of tort liability long ago made by Oliver Wendell Holmes, Jr. in his 1894 paper on *Privilege, Malice, and Intent,* 8 Harv.L.Rev. 1. In the more usual torts, with which the future Justice Holmes dealt, plaintiff bears the burden of proving merely defendant's breach of duty, causation, and damages; and defendant has the burden of exculpating himself by proving privilege or other justification for any injury he caused plaintiff to suffer. However, with respect to the tort of wrongful use of civil proceedings plaintiff also bears the burden of proving that the proceedings which caused him injury have terminated in his favor. For this exception to the general tort rule there is a readily understood explanation. It is both fair to the parties and economically convenient to the judicial system to allow defendant to proceed (unaffected by estoppel by judgment or like doctrines) with his original action. Defendant ought to have his day in court in the locus where he began the controversy. Until that first court has decided the merits, or has ruled that it will not decide the case for want of jurisdiction or improper venue, or defendant in his capacity as plaintiff in the first action has withdrawn from the first litigation, plaintiff is premature. To be sure, plaintiff already has been injured by the bringing of the first action, but it is socially convenient to make him await the outcome of the first case in order to save the time and expenses of litigants and courts. As long as the proceedings are going on in the first court, the second court will not be bothered to hear the matter.

Hence, plaintiff has the burden of proving three elements: (1) that the proceedings were initiated without probable cause to believe that the claim asserted might be held valid, (2) that the proceedings were initiated for a purpose other than that of showing the proper adjudication of the claim, and (3) that the proceedings were terminated in his favor. See Restatement (Second) of Torts § 674(b), comment (g) at 455.

But any form of termination of defendant's cause of action satisfies the social policy which underlies the rule which requires plaintiff to prove as an element of his cause of action that "the proceedings were terminated in his favor." After termination there can no longer be a duplication of judicial forums. No longer can there be a race for diligence. No longer can defendant be deprived, by doctrines of estoppel or otherwise, of his day in the court he chose.

It follows that a dismissal of defendant's cause of action on the ground of lack of venue, even if it was without prejudice, and was not upon the merits in any sense, furnishes the necessary third element of the alleged cause of action for wrongful use of civil proceedings.

What we have just said seems to be in accord with Restatement (Second) of Torts § 674, which provides:

One who takes an active part in the initiation, continuation or procurement of civil proceedings against another is subject to liability to the other for wrongful civil proceedings if

(a) he acts without probable cause, and primarily for a purpose other than that of securing the proper adjudication of the claim in [sic! probably this should read "on"] which the proceedings are based, and

(b) except when they are ex parte, the proceedings have terminated in favor of the person against whom they are brought.

Moreover, it seems to be in accord with the law of New Jersey. *Mayflower Industries v. Thor Corp.,* 15 N.J.Super. 139, 83 A.2d 246, 257 (1951), *aff'd* 9 N.J. 605, 89

A.2d 242 (1952). And it is the law of that state of New Jersey which seems to be the appropriate law to choose since the alleged wrongful conduct occurred exclusively in that state.

■ We are not unmindful that in comment (g) at 456 the Restatement incautiously states broadly that "the invalidity of the claim [of defendant] is conclusively established by its unsuccessful prosecution [in the first court] and cannot be relitigated." See also comment (c) at 454, fourth full paragraph. That may well be true if the first court has adjudicated the merits; for then there would be an estoppel by judgment. But where, as in the case at bar, the termination of the action in the first court was avowedly not on the merits, there is no ground that we perceive why defendant in the second action may not be allowed to show that he was justified on the merits in bringing his complaint in the first court.

In any event, in the instant case this particular defendant, American Cyanamid Company, was allowed in the district court to try to prove that on the merits it had a good cause of action against Mitchener and Hammond. American's difficulty was that the evidence was overwhelmingly against it.

JUDGMENTS AFFIRMED.